# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Jones*, 2012 IL App (1st) 093180

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KENNEITH JONES, Defendant-Appellant. |
| District & No. | First District, Second Division<br>Docket No. 1-09-3180 |
| Filed | May 1, 2012 |
| Rehearing denied | May 30, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The dismissal of defendant's postconviction petition following a full evidentiary hearing was affirmed, notwithstanding defendant's contentions that the trial court committed evidentiary errors, his counsel failed to investigate and call alibi witnesses, he was innocent and the State committed a *Brady* violation, since the trial court properly ruled that the testimony of the postconviction witnesses was unreliable and not of such a conclusive character that it would have resulted in a different outcome, defendant could not establish a due process violation arising from an eyewitness's postconviction testimony recanting her trial testimony that defendant was the murderer, the State's failure to disclose the exculpatory information about the recanting eyewitness did not constitute a *Brady* violation where defendant was identified by other eyewitnesses and the eyewitness's uncertainty would not likely have changed the result, and defense counsel's performance met the objective standard of reasonableness. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 96-CR-19441; the Hon. Kevin Sheehan, Judge, presiding. |

| | |
|---|---|
| Judgment | Affirmed. |
| Counsel on Appeal | Abishi C. Cunningham, Jr., Public Defender, of Chicago (Denise Avant and Harold J. Winston, Assistant Public Defenders, of counsel), for appellant. |
| | Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Joan Frazier, and Michele Grimaldi Stein, Assistant State's Attorneys, of counsel), for the People. |
| Panel | PRESIDING JUSTICE QUINN delivered the judgment of the court, with opinion.<br>Justices Connors and Harris concurred in the judgment and opinion. |

**OPINION**

¶ 1    Defendant, Kenneith Jones, appeals from a judgment entered by the trial court that dismissed his postconviction petition after a full evidentiary hearing. Jones filed a timely notice of appeal on November 9, 2009, and the appeal was fully briefed on January 4, 2012.

¶ 2    On appeal, defendant argues that: (1) he received an unfair postconviction hearing because of evidentiary errors committed by the court; (2) he was denied effective assistance of counsel at his criminal trial when his counsel failed to thoroughly investigate and call alibi witnesses and witnesses who could have corroborated statements one Dwight Washington made against his penal interests; (3) his conviction should be reversed because of his claim of innocence; and (4) the State committed a *Brady* violation (*Brady v. Maryland*, 373 U.S. 83 (1963)), which now entitles him to a new trial. The postconviction court held a hearing on the petition where 12 witnesses testified. After hearing all the testimony, the court denied the postconviction petition in all respects. This opinion addresses issues raised in defendant's brief after addressing the recent case of *People v. Henderson*, 2011 IL App (1st) 090923, and its application.

¶ 3    A preliminary review of this case revealed that Jones had fully served the sentence imposed for his conviction of first degree murder and he is no longer in the custody of the Illinois Department of Corrections (IDOC) or under their supervision as a parolee. This court is aware of the recent holding in *People v. Henderson*, 2011 IL App (1st) 090923, that dismissed Henderson's postconviction petition on appeal as moot when the appellate court determined that he had fully served his sentence. It reasoned that because the defendant no longer needed the assistance of the Post-Conviction Hearing Act (the Act) (725 ILCS 5/122-1 to 122-8 (West 2008)) to secure his liberty, he immediately lost standing under the Act. We

ordered additional briefing to obtain the parties' positions as to whether the holding in *Henderson* requires the dismissal of this defendant's appeal as moot.

¶ 4    The State responded to the issue forthrightly by stating that it was the position of the State's Attorney's office that the *Henderson* court's dismissal of defendant's postconviction petition as moot on appeal was wrong and not grounded in established supreme court precedent. The State's position is that Henderson's release from parole subsequent to his timely filed petition did not eliminate his standing to obtain relief pursuant to the Act and render his petition moot. We disagree with the holding in *Henderson* for the following reasons.

¶ 5                    I. Summary of Illinois's Postconviction Procedure and

Analysis of *Henderson*'s Applicability

¶ 6    In addition to review on direct appeal following a criminal conviction, certain collateral, statutory remedies have been made available under which criminal convictions may be challenged. In Illinois the Act is one such remedy. Under the Act "[a]ny person imprisoned in the penitentiary may institute a proceeding." 725 ILCS 5/122-1(a) (West 2008). While the entire Act consists of only 1½ pages of text in the statute books, litigation stemming from the Act has resulted in an incredible number of court decisions since being enacted in 1951. One such area concerns the time limits within which a defendant must file his or her original petition. Under the current statutory framework, a postconviction petition must be filed by the earliest of the following two dates: (1) six months after the conclusion of any appeal to the United States Supreme Court or six months after the date for filing such appeal if none is filed; or (2) if no direct appeal is filed, three years from the date of conviction. 725 ILCS 5/122-1(c) (West 2008). In any instance, the petitioner may be excused from meeting these filing deadlines if it can be shown that the delay was not due to his or her culpable negligence. 725 ILCS 5/122-1(c) (West 2008). Legal proceedings under the Act have been deemed to be civil in nature. *People v. Andretich*, 244 Ill. App. 3d 558 (1993). The time periods for filing a timely petition have been held to be statutes of limitations. *People v. Allen*, 322 Ill. App. 3d 724, 725 (2001) (citing *People v. Bates*, 124 Ill. 2d 81, 85-86 (1988)). A statutory civil cause of action that is timely filed cannot be declared moot by subsequent events.

¶ 7    Additionally, just as our supreme court has determined that the matter of timeliness of a postconviction petition should be left for the State to assert (*People v. Boclair*, 202 Ill. 2d 89, 102 (2002)), in *People v. Hager*, 202 Ill. 2d 143 (2002), issued the same day as *Boclair*, the supreme court reversed the appellate court's *sua sponte* dismissal of a postconviction petition as untimely and ordered the appellate court to limit its review on remand to whether or not the petition was "frivolous or patently without merit." *People v. Hager*, 202 Ill. 2d at 149-50. It would appear from these two decisions that the appellate court should refrain from considering the issue of timeliness, absent a motion to dismiss by the State and a ruling by the trial court. It would follow that the appellate court should not decide issues of mootness of the entire petition absent allowing the petitioner to respond.

¶ 8    Application of the *Henderson* decision which allowed for appellate court dismissal of a

petition merely because the petitioner has served his sentence is troubling for another important reason. Many of these petitions frequently experience delays not found in other categories of cases before they receive final review. For instance, in the instant case, the defendant was sentenced in 1999. Defendant's conviction was affirmed in 2000 on direct appeal after the filing of an *Anders* brief. *People v. Jones*, No. 1-99-1235 (Sept. 29, 2000) (unpublished order under Supreme Court Rule 23). In March 2001, defendant filed his postconviction petition, which was summarily dismissed by the trial court in June 2001. On appeal, this court remanded the case for appointment of counsel and further proceedings in June 2005. *People v. Jones*, 364 Ill. App. 3d 1 (2005). Two years later, the public defender's office filed a supplemental petition to the *pro se* petition on Kenneith Jones's behalf. On remand, the trial court held an evidentiary hearing on the petition on various dates from March 19, 2008 to November 4, 2009, when the circuit court denied defendant any relief pursuant to his postconviction petition. On appeal, it took over two years for this case to be fully briefed and ready for decision.

¶ 9    The public offices charged with representing the parties in these postconviction petitions suffer from understaffing and underfunding, which predictably result in severe backlogs. While the instant defendant, Kenneith Jones, is represented on appeal by the Cook County public defender's office, the State Appellate Defender's office represents the vast majority of appellants in criminal cases, including Henderson. A recent motion for extension of time filed by an assistant State Appellate Defender represented to this court that while her "office has eighty (80) full-time and fourteen (14) part-time assistant defenders working on cases," they are currently experiencing "a backlog of approximately 1043 unbriefed cases." People v. Brown, No. 1-11-2009 (pending appeal; motion for extension of time to file brief for appellant, pages 1-2, paragraph 8, filed February 24, 2012). The State's Attorney's office's appellate staff has also represented that its office is experiencing "a backlog of over 200 unassigned cases, and an understaffed Criminal Appeals Division *** which is currently down 37 assistant state's attorneys and one paralegal." People v. McKinney, No. 1-10-3696 (pending appeal; motion for an extension of time for the filing of the people's brief, page 2, paragraph 10, filed February 28, 2012).

¶ 10    We hold that the instant postconviction petition was timely filed and, as such, is not moot. Our decision rests on a foundation of prior Illinois Supreme Court cases where the court has made clear that all that is required is that a petitioner must still be serving any sentence imposed, including any period of mandatory supervised release, at the time of the initial timely filing of his petition. *People v. Davis*, 39 Ill. 2d 325 (1968); *People v. Carrera*, 239 Ill. 2d 241 (2010).

¶ 11    Specifically, the *Davis* court directly addressed this issue, as follows:

"From the outset of the post-conviction hearing the State has asserted that the petition should be dismissed because Davis was not incarcerated at the time the cause was heard. The State relies on the wording of the Post-Conviction Hearing Act which gives 'any person imprisoned in the penitentiary' the right to allege a substantial denial of constitutional rights [citation] and this court's comment that the legislative intent behind this provision was 'to make the remedy available only to persons actually being deprived of their liberty and not to persons who had served their sentences and who might wish

-4-

to purge their records of past convictions.' [Citation.] In some jurisdictions post-conviction remedies may be utilized to attack unconstitutional convictions regardless of the fact that petitioner has fully served his sentence. [Citations.] Others restrict use of this remedy, usually because of statutory language, to those persons actually imprisoned at the time of hearing. [Citations.] As there are obvious advantages in purging oneself of the stigma and disabilities which attend a criminal conviction, we see no reason to so narrowly construe this remedial statue as to preclude the remedy in every case in which the petition is not filed and the hearing completed before imprisonment ends." *People v. Davis*, 39 Ill. 2d at 328-29.

¶ 12    It would frustrate justice to shut the door on the one avenue for Illinois prisoners to obtain relief from a criminal conviction on constitutional grounds because the State and Appellate Defender's office delayed, through no fault of their own, a petitioner's case for so long that he eventually serves his entire sentence and is released. The just thing to do would be to address the merits of the petition on appeal, which we will do in the remainder of this opinion.

¶ 13                            II. Procedural Background

¶ 14    On July 10, 1996, a 14-year-old girl named Shekena Waltower was shot in the head and killed as she sat outside her home. A bench trial was held and defendant Kenneith Jones was found guilty of first degree murder and sentenced to 25 years in prison. A direct appeal of Jones's conviction followed. This court allowed defense counsel to withdraw as appellate counsel and affirmed defendant's conviction after determining that there were no issues of arguable merit pursuant to *Anders v. California*, 386 U.S. 738 (1967). *People v. Jones*, No.1-99-1235 (Sept. 29, 2000) (unpublished order under Supreme Court Rule 23).

¶ 15    On March 27, 2001, defendant filed a *pro se* petition for postconviction relief alleging that his trial counsel's representation was constitutionally deficient because counsel had (1) failed to interview certain alibi witnesses; (2) decided not to call certain alibi witnesses that he had been informed of; and (3) ineffectively cross-examined the State's key witnesses, including a failure to investigate the possibility that another person committed the murder of Shekena Waltower. Defendant supported his *pro se* petition with six affidavits and an investigative report prepared by the State's Attorney's office. On June 1, 2001 the trial court summarily dismissed defendant's *pro se* petition on the basis of waiver and *res judicata* because each of the issues raised in the petition either was raised or could have been raised on direct appeal of his criminal conviction. On appeal from the summary dismissal of the postconviction petition, this court found that the *pro se* petition advanced the gist of a constitutional claim. The summary dismissal of the *pro se* petition was reversed and remanded with directions to the trial court that the petition be considered in accordance with sections 122-4 through 122-6 of the Post-Conviction Hearing Act (725 ILCS 5/122-4 to 122-6 (West 2008)). *People v. Jones*, No. 1-10-3731 (June 9, 2005) (unpublished order under Supreme Court Rule 23). Two years later, the public defender's office filed a supplemental petition. On October 25, 2007, the original trial judge, Judge Sumner, ordered an evidentiary hearing on whether defendant's trial counsel provided constitutionally ineffective assistance,

-5-

whether there was sufficient evidence of defendant's actual innocence and whether there was a *Brady* discovery violation by the State. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). The hearing was conducted on various dates from March 2008 through November 4, 2009 and was presided over by Judge Kevin Sheehan, who heard the testimony of 12 witnesses; 8 offered by the defense and 4 offered by the State. The court denied the petitioner any relief on November 4, 2009. We are now asked to review the dismissal of the postconviction petition after appointment of counsel and after a full evidentiary hearing was held on remand.

¶ 16                                    III. Trial Facts

¶ 17        At approximately 10 p.m. on July 10, 1996, Shekena Waltower was shot in the head in front of her home. She was the innocent victim of a gang dispute between the Cicero Insane Vice Lords and the Four Corner Hustler street gangs. At trial, the State presented evidence that defendant Kenneith Jones and Keith King were both members of the Four Corner Hustlers gang. They entered the territory of the neighboring Cicero Insane Vice Lords gang, pulled out their automatic handguns and fired approximately 20 to 30 shots into a small group of people gathered in front of the home where the victim, Shakena Waltower lived. None of the bullets hit any of the gang members from the Cicero Insane Vice Lords who were in front of Shekena's house. However, Shekena was killed almost instantly when a single bullet went through her head.

¶ 18        During defendant's bench trial, numerous witnesses testified regarding their observations that night. Sonia Easley and her 13-year-old daughter, Pia Easley, lived across the street and a few houses west from the victim, Shekena. Both mother and daughter sat on their porch together. Sonia entered her home to answer a ringing phone. While inside, she heard two shots, followed by a rapid series of shots. From her second-floor apartment window, Sonia observed the defendant pointing his gun in a northeasterly direction with fire coming out of it. She observed him flee the scene on foot. Sonia positively identified defendant Kenneith Jones three hours later in a police lineup as the man she saw firing the gun in the direction of Shekena's house.

¶ 19        Pia Easley, while sitting on her porch, saw two men walking eastbound down the street toward her. She observed both men leave the sidewalk shortly before they reached her house and walk into the middle of the street. Shortly after the two men passed her, they began firing numerous times in the direction of people gathered in front of Shekena's home. After the shooting stopped, Pia ran into the hallway of her home and from there she observed the two men run back in front of her building as they fled the scene. She had never seen these two men before, but was able to identify both the defendant and Keith King in a police lineup three hours later.

¶ 20        The shooting was also witnessed by David Freeman, Derrick Brooks and Antojuan Chew. David and Derrick were Cicero Insane Vice Lord gang members and the intended victims. David Freeman and Antojuan Chew were cousins of the victim, Shekena. As they stood in front of Shekena's house, David, Derrick and Antojuan each noticed two men walking east on Fulton and as they got closer, all three recognized the two men as members of the Four Corner Hustler street gang who lived north on Fulton. Cousins Derrick and Antojuan had

attended Spencer Elementary School with the defendant, Kenneith Jones, and David knew both approaching men from the neighborhood. Derrick also recognized Keith King as someone who had stolen his younger brother's McDonald's food in the recent past.

¶ 21 When the two men were approximately 50 feet from the group gathered in front of Shekena's home, they opened fire and shot between 20 to 30 times at the group. Two police officers arrived at the scene within minutes. They received descriptions of the gunmen from five to eight people at the scene. The witnesses described two black males. The first one was described as tall and thin and wearing dark clothing. The second one was the same height as the first and wearing dark clothing, but he was described as heavier in build and wearing a bright, sequined cap. None of the witnesses provided the police with the names of the gunmen.

¶ 22 The two officers immediately left to conduct a search of the area and within a few minutes spotted the defendant, Kenneith Jones, and another black male who fit the physical and clothing descriptions of the pair of gunmen provided by eyewitnesses. Both men were arrested and placed in lineups. Approximately three hours after the murder, Sonia Easley, Pia Easley, David Freeman, Derrick Brooks and Antojuan Chew each took turns and positively identified defendant, Kenneith Jones, and Keith King as the gunmen.

¶ 23 Defendant called his mother, Demetria Jones, his girlfriend, Crystal Johnson, and a friend, Antwon Farmer, as alibi witnesses who testified that the defendant was 2½ blocks away at the time of the shooting. They were close enough that they heard the shots fired.

¶ 24 Defendant, Kenneith Jones, and Keith King were tried together in a bench trial and both were convicted of the first degree murder of Shekena Waltower. The trial judge gave little weight to the testimony of the two Cicero Insane Vice Lord gang members who testified, but considered the testimony of the other eyewitnesses Sonia Easley, Pia Easley and Antojuan Chew, and found that defendant's guilt was proven beyond a reasonable doubt.

¶ 25 IV. Summary of the Postconviction Petition and the Hearing

¶ 26 The postconviction evidentiary hearing centered around whether or not it was possible that Shekena Waltower was murdered by one of Kenneith Jones's now-deceased fellow gang members, Dwight Washington.

¶ 27 The supplemental petition filed in support of the *pro se* petition disclosed three additional alibi witnesses, two of whom signed affidavits dated in June 2006, and claimed to have evidence of Kenneith Jones's innocence because of Jones's whereabouts on the night of the murder and certain statements Dwight Washington allegedly made to them in 1996.

¶ 28 A total of 12 witnesses testified during the postconviction hearing. The eight witnesses called by the defendant were Errick Tiggs, Willie Evans, Pia Easley, Frankie Summers, Trillia Sapp, Corey Baugh, Calvin Davis and Charles Buchholz. The four witnesses called by the State were retired Chicago police detective Michael Mason, Detective Michael Landando, and two State's Attorney's office investigators, Renonia Galvin and Joanne Ryan.

¶ 29 Errick Tiggs's June 2006 affidavit stated he was with the defendant and others blocks away at the time of the shooting. Tiggs also stated that Dwight Washington asked him to hide

a gun for him that night because he had shot at Cicero Insane Vice Lords and killed the girl who was shot at 10 p.m. In a second affidavit signed six months later, Tiggs stated that he thought of additional information and averred that 30 minutes before the shooting, Dwight Washington told him and others that a member of the Cicero Insane Vice Lords gang pulled a gun on him. Washington then attempted to recruit Tiggs and the others to help him catch the gang member and hurt him. Tiggs now stated that Keith King was the only one willing to go with Dwight Washington. Tiggs also stated he now recalled that the remaining group went to Tiggs's house after they heard the shooting and that Washington was already there when they arrived. Tiggs averred that Washington admitted that he and King were the shooters. Tiggs stated that he urged Washington to turn himself into police and further stated that he told all of this to Jones's trial attorney at the start of Jones's trial.

¶ 30    At the postconviction hearing, Errick Tiggs testified that he, defendant and others were playing basketball when Keith King and Washington, who were also present, left. Tiggs told the court that he heard shots 10 to 15 minutes later. The group then was headed to the liquor store when defendant and King were arrested on the street. Neither Tiggs nor anyone else came to their defense at the time of the arrest. When Tiggs arrived home about an hour later, he stated Dwight Washington was at his home with five other people. Tiggs testified that he did not see Dwight Washington with a gun all night. He was still with Washington in the early morning hours of the next day and after everyone else had left, he testified, Washington "basically told me he was, he went down there, he was shooting, he think he shot somebody, and blah, blah, and that's about it." Tiggs testified that two days later, he urged Washington to turn himself in. He further related that in February 1997 he offered to wear a wire to prove Washington's alleged admissions during an interview with an assistant State's Attorney. Tiggs testified at the hearing to two meetings he had with defendant's trial counsel, but during cross-examination, he denied that he told defendant's attorney about Washington's alleged admissions.

¶ 31    The second affidavit was from Willie Evans. His affidavit stated that on the day of the shooting he was with a group of men that included the defendant and Dwight Washington. He stated Washington left the group. About 15 minutes later he heard shots and defendant was still with him. He stated that defendant was arrested while the group walked to a liquor store. He stated that Keith King had joined them while they were walking. It was at that time that defendant and King were arrested. Evans then testified that he went to Tiggs's home. Dwight Washington came there at about 11:30 p.m. Evans claimed in his affidavit that Washington told him he and someone else had seen "Dirty Derrick" that night and started shooting at him. He stated that Derrick had grabbed a little girl to use as a shield as he ran away. Evans stated he spoke to defendant's trial counsel and stated he was willing to testify but was never called. He testified to this at the hearing, as well.

¶ 32    Pia Easley, an eyewitness who positively identified defendant in a lineup three hours after the murder and again at trial, retracted her positive identification of defendant. In her first affidavit, Pia averred that Kenneith Jones was not one of the gunmen. In an amended affidavit, she now averred that she was "now convinced that I do not know if he was one of the two" gunmen. Although she stated in her first affidavit that defendant's trial attorney never tried to interview her, she stated in her second, amended affidavit that he attempted to

interview her but that her mother, Sonia Easley, also an eyewitness, did not allow him to interview her. Pia also averred in her second affidavit that her vision in her left eye was poor when she was not wearing glasses. She averred that even though she had astigmatism in her right eye, she could see out of her right eye. She also stated that the assistant State's Attorney did not force her to testify against Kenneith Jones at his trial. She stated she convinced herself he was the gunman and told the prosecutor she was sure it was him.

¶ 33    At the hearing, Pia Easley testified that she had a slight astigmatism in her left eye and that her right eye was perfectly fine. She stated that she could distinguish shapes at any distance. She also stated that at night she could recognize someone's face without corrective lenses. She admitted that she was not wearing any corrective eyewear while testifying at the hearing and she could see just fine. Pia stated she was still positive about her trial testimony which identified Keith King as one of the gunmen, but no longer was as certain about her identification of Kenneth Jones. She testified she was having second thoughts about her prior positive identification after having conversations with the defendant's sister, with people who claimed to know certain things but never came forward to testify, and with people who stated the real gunman that night told them he was the one who committed the murder.

¶ 34    Frankie Summers testified at the postconviction hearing that in 1996 on the night of the murder, she and her sister were selling food on their porch while a group of men, including defendant, were playing basketball in the back. She stated that the defendant was there when shots were fired that night. She denied ever seeing him leave the area that night. Although Summers verified the signature on her affidavit as hers, she initially had no recollection of signing it, did not know who prepared it, and did not know who requested that she sign it.

¶ 35    Trillia Sapp testified at the postconviction hearing that Dwight Washington periodically stayed at her house during the summer of 1996. She testified that on the day of the murder when the sun was still up, Dwight Washington came to her home and told her he had "messed up." She testified that later she overheard Washington state that he had shot the girl. She also overheard him make similar comments to others the following day. Sapp stated that she never told anyone about overhearing these comments until late 1997 when she told a female assistant State's Attorney who had called her home looking for Errick Tiggs. Sapp also testified that she never told defendant's trial attorney about these comments she allegedly overheard Washington make to others.

¶ 36    Corey Baugh was also called to testify at the hearing. He was in prison for a murder conviction at the time of the hearing. He testified that he was present when Shekena Waltower was murdered. Although police reports indicated that Baugh tentatively identified the defendant as one of the shooters in the original lineup in 1996, he testified that he told police officers that defendant was not one of the shooters and repeated this to the assistant State's Attorney before he was called to give grand jury testimony in the case. Baugh admitted on cross-examination that his testimony at this hearing was different from what he previously told investigators. Baugh further testified that police officers tried to coax him into identifying defendant in the lineup but he refused and stated that defendant was not one of the gunmen.

¶ 37        Calvin Davis also testified at the postconviction hearing claiming to be an eyewitness to the murder. He is a four-time convicted felon. He admitted that he did not tell anyone what he witnessed until 11 years after the murder. He was interviewed by State's Attorney investigators and told them he learned that Dwight Washington was one of the gunmen from an unnamed friend. He testified that he knew the defendant from the neighborhood and because he was there on the night of the murder and saw what happened, he knows defendant was not one of the gunmen.

¶ 38        Defendant's trial counsel, former Assistant Public Defender Charles Buchholz, testified at the postconviction hearing. Buchholz testified that after being apprised of Tiggs's statement possibly implicating Dwight Washington, he met with Washington at Cook County jail prior to trial. He observed that Washington and defendant shared a similar height and build. He informed Washington of the allegations possibly implicating him, and further added that he did not believe his client committed the murder. He also asked Washington why he was letting one of his fellow gang members get blamed for something Washington did. Washington responded with a shrug. Buchholz concluded, in his professional opinion, that no benefit would result from calling Washington as a witness at Jones's trial.

¶ 39        Buchholz testified that he interviewed all 19 witnesses that defendant's mother provided to him, visited the scene, reviewed all investigative reports and all of the witnesses' statements, reviewed the lineup identifications and read the grand jury testimony and personally conducted interviews of key witnesses. Buchholz testified that he never heard Calvin Davis mentioned while preparing for trial. Buchholz testified as to why he did not call certain witnesses who subsequently testified at the postconviction hearing. Basically, the alibi witnesses contradicted themselves and each other as to key facts, like whether and when Kenneith Jones and Keith King were with them. Corey Baugh was not called because of his tentative identification of defendant during the lineup. One of the alibi witnesses seemed to not do a good job during trial testimony and Buchholz did not want to hurt the defense any more than had already been done with this witness's trial testimony by calling more of the same.

¶ 40        Three months after Buchholz testified, the defense moved to admit Buchholz's subsequent affidavit as additional evidence in support of the postconviction petition. Buchholz averred that it was his belief that the defendant did not commit the murder of Shekena Waltower. The court refused to admit Buchholz's affidavit into evidence, holding that trial counsel's personal opinion regarding his client's guilt was irrelevant.

¶ 41        The State called four witness at the postconviction hearing. Retired Chicago police detective Michael Mason testified that he was present when Pia Easley, an eyewitness at the trial and an equivocating witness at the postconviction hearing, positively identified the defendant in the 1996 lineup. He stated that Pia never expressed any doubt as to her identification and no one instructed her that she must pick out two people. He also had no reason to question whether Pia had any vision problems.

¶ 42        Detective Mason also testified regarding Corey Baugh's postconviction testimony. He testified that Baugh tentatively identified the defendant in the 1996 lineup. Mason specifically denied putting any pressure on Baugh to positively identify defendant. He also

testified that Baugh never identified Keith King in the lineup. Baugh also never referred to any names or said he knew one of the gunmen. Further, Mason stated that Baugh never claimed to have seen either of the two gunmen's faces.

¶ 43    The State called Detective Michael Landando regarding Errick Tiggs's postcoviction testimony. Detective Landando was present during the 1997 interview of Errick Tiggs in relation to this murder. He unequivocally testified that the possibility of Tiggs wearing a recording device was never mentioned by him, Tiggs or the assistant State's Attorney. He also stated that Dwight Washington was the only person ever named or interviewed regarding any alleged admission made by Washington to a third party. Detective Landando testified that he talked to Washington and he denied making any statements to anyone that implicated him in the murder of Shakena Waltower. Washington stated that on the day of the murder he played basketball for most of the day and was home taking a shower and ironing his clothes when the murder occurred. Washington stated he learned of the murder later from Errick Tiggs and that Tiggs would say anything that gang officers told him to say.

¶ 44    State's Attorney's office investigator Renonia Galvin testified at the postconviction hearing as to her interviews of Frankie Summers, Corey Baugh and Calvin Davis. Frankie Summers corrected her affidavit to indicate her belief that the murder occurred at 8 p.m. instead of when it actually occurred at 10 p.m. Corey Baugh told her that he was present and when gunmen started shooting he immediately ran away and fell to the ground. Calvin Davis did not tell Investigator Galvin that he was able to see the gunmen's faces and never mentioned their complexions.

¶ 45    State's Attorney's office investigator Joanne Ryan testified about her interviews with three postconviction witnesses, Willie Evans, Trillia Sapp and Errick Tiggs. Evans stated that he heard the shots between 6:30 p.m. and 7 p.m., and clarified it as about the time it was "starting to get dark." Trillia Sapp stated to Investigator Ryan that it was still light outside when Dwight Washington arrived at her home and it was still light when Errick Tiggs and the others arrived. Sapp stated she overheard Dwight Washington state he had "messed up" and overheard others tell Washington to turn himself in. Errick Tiggs told Investigator Ryan that at 6 p.m or 7 p.m. he was with a group and that Dwight Washington and Keith King left the area. Approximately 15 minutes after they left, Errick Tiggs heard shots fired. Tiggs placed Kenneith Jones with him at the time he heard those shots at 6:15 p.m. or 7:15 p.m.

¶ 46    At the conclusion of the hearing, Judge Sheehan found that defendant's trial "counsel's performance fell well within the competency standards of *Strickland*." *Strickland v. Washington*, 466 U.S. 668 (1984). The court found the testimony of Tiggs, Sapp and Evans failed to meet the criteria for reliability outlined in *Chambers v. Mississippi*, 410 U.S. 284 (1973). The court held that the bench trial was not a "closely balanced" case and rejected the defense's argument that the testimony of Tiggs, Sapp and Evans could be used to corroborate each other. The court found the testimony of both Baugh and Davis incredible. It found that their testimonys contradicted each other's and the other admitted evidence from the criminal trial and postconviction hearing. The court also found that defendant failed to present a freestanding claim of actual innocence because the same evidence used to support a claim of innocence was also used to support his claim of ineffective assistance of counsel. For all the above reasons, the court denied defendant's postconviction petition.

¶ 47                                    V. Analysis

¶ 48                              A. Standard of Review

¶ 49       Kenneith Jones was afforded a full evidentiary hearing on the constitutional issues raised in his postconviction petition. While neither party submitted a standard of review for this court to apply to our review of this hearing, the manifestly erroneous standard is the characteristic appellate standard of review for findings of fact made by a trial judge arising from a postconviction hearing. *People v. Coleman*, 183 Ill. 2d 366, 384-85 (1998). A judge's ruling on a postconviction petition following an evidentiary hearing is entitled to substantial deference. *People v. Scott*, 194 Ill. 2d 268, 276 (2000). Our supreme court has determined that the judge's ruling on a postconviction petition after an evidentiary hearing must be affirmed unless it is manifestly erroneous. *People v. Scott*, 194 Ill. 2d at 276; *People v. Morgan*, 187 Ill. 2d 500, 528 (1999). A trial judge commits a manifest error when the error is clear, plain, evident and indisputable. *People v. Ortiz*, 235 Ill. 2d 319, 333 (2009) (quoting *People v. Morgan*, 212 Ill. 2d 148, 155 (2004)). For a reviewing court to find that a trial judge's decision is manifestly erroneous, it must find that the decision is not based on the evidence, is arbitrary and is unreasonable. *People v. Leach*, 245 Ill. App. 3d 644 (1993). The burden of convincing a reviewing court that a trial court's decision was manifestly erroneous is a heavy one. *People v. Gorman*, 207 Ill. App. 3d 461 (1991). It is this standard we apply in our determination of the court's final ruling following the postconviction hearing in this case.


¶ 50            B. The Fairness of the Postconviction Evidentiary Hearing

¶ 51       We address defendant's contention that he did not receive a fair postconviction hearing and his argument of error in key evidentiary rulings which he submits support his postconviction petition. The trial court allowed each of the 12 witnesses to testify in full at the postconviction hearing. It is the analysis and rulings regarding their testimony that are at issue. Much of the evidence that was subsequently criticized in the trial court's ultimate ruling surrounded defendant's attempt to show that Dwight Washington, a now-deceased fellow gang member, was the real murderer of Shekena Waltower and that the defendant had an alibi for 10 p.m. when Shekena was murdered.

¶ 52       The rules of evidence are not abandoned during an evidentiary hearing on a postconviction petition. Whether or not evidence is admitted during any hearing is within the sound discretion of the trial court. Such rulings are not reversed unless there is a clear showing of abuse of discretion by the trial court. *People v. Tenney*, 205 Ill. 2d 411, 436 (2002). Our supreme court has stated that "[a]buse of discretion is the most deferential standard of review–next to no review at all–and is therefore traditionally reserved for decisions made by a trial judge in overseeing his or her courtroom or in maintaining the progress of a trial." (Internal quotation marks omitted.) *In re D.T.*, 212 Ill. 2d 347, 356 (2004). In this case, an abuse of discretion would exist only if the trial court's evidentiary

rulings are "arbitrary, fanciful or unreasonable" or when "no reasonable [person] would take the view adopted by the trial court."(Internal quotation marks omitted.) *People v. Donoho*, 204 Ill. 2d 159, 182 (2003).

¶ 53                      C. Our Analysis of Testimony Criticized by the
                                    Trial Court in Its Final Ruling

¶ 54     Relying on *Chambers v. Mississippi*, 410 U.S. 284 (1973), the court rejected statements allegedly made by Kenneith Jones's now-deceased fellow gang member, Dwight Washington, to others. It is argued that Washington's statements were self-incriminating and now show that Washington, not Kenneith Jones, murdered Shekena Waltower. The court heard the witnesses testify in full at the postconviction hearing to Dwight Washington's alleged statements, which, it is argued, implicate him in the murder.

¶ 55     Generally, unsworn, out-of-court statements made by a deceased witness or a witness who is beyond the court's jurisdiction are inadmissible hearsay, even if the statement purportedly made by the deceased or unavailable witness is against his penal interest. *People v. McCallister*, 193 Ill. 2d 63, 100 (2000). This general rule acknowledges that to hold otherwise would " 'tempt[ ] everyone accused of a crime to introduce perjured testimony that a third party, then deceased or beyond the jurisdiction of the court, had declared that he, and not the accused, had committed the crime.' " *People v. Tenney*, 205 Ill. 2d 411, 433-34 (2002) (quoting *People v. Lettrich*, 413 Ill. 172, 178 (1952)).

¶ 56     Keeping in mind that a legal rule is rarely a rule unless there is an exception, hearsay statements may be admitted as justice requires provided they can be shown to be trustworthy. *People v. Tenney*, 205 Ill. 2d at 433-34; *People v. Anderson*, 367 Ill. App. 3d 653, 664 (2006). Illinois courts have adopted and applied the four criteria outlined by the United States Supreme Court in *Chambers v. Mississippi*, 410 U.S. 284, 300-01 (1973), to demonstrate trustworthiness of hearsay such as the purported out-of-court statements attributed to Washington. The four criteria used to determine if a hearsay statement falls within the exception are as follows: (1) it was made spontaneously to a close acquaintance shortly following the crime; (2) it was corroborated by other evidence; (3) it was self-incriminating and against the declarant's interest; and (4) there is adequate opportunity for cross-examination of the declarant. *Chambers*, 410 U.S. at 300-01.

¶ 57     The existence of all four *Chambers* criteria is not a condition precedent for a statement to come within the exception and be admitted. *People v. Tenney*, 205 Ill. 2d at 435-36. However, generally, if one or more of the criteria, but not all four, are met, the hearsay statements are held to be insufficiently trustworthy. *People v. Gallano*, 354 Ill. App. 3d 941, 957 (2004). In Illinois, the key to whether the hearsay is admissible "is whether the declaration was made under circumstances that provide 'considerable assurance' of its reliability by objective indicia of trustworthiness." (Internal quotation marks omitted.) *People v. Abrego*, 371 Ill. App. 3d 987, 992 (2007) (quoting *People v. Bruel*, 111 Ill. 2d 58, 67 (1986)).

¶ 58     Because Dwight Washington is now dead, the above-mentioned fourth *Chambers* factor cannot be met. There is no opportunity, adequate or otherwise, to cross-examine Washington about the statements attributed to him by others at the postconviction hearing. What we do

know from the testimony of defendant's trial attorney, Buchholz, at that same hearing is that he met with Washington prior to Kenneith Jones's criminal trial. Washington was also alive during the pendency of the trial. Buchholz questioned Washington, who was incarcerated, about information Buchholz obtained that indicated Washington may have been the gunman. Washington provided an alibi and denied being the gunman. Additionally, the State pursued this theory that Washington may have been one of the two gunmen based on information Errick Tiggs supplied to the State that implicated Washington. Prior to defendant's criminal trial, Detective Landando also interviewed Washington. He provided Detective Landando with the identical alibi he gave to Buchholz. Again, Washington denied having any involvement in Shakena Waltower's murder, reinforcing Buchholz's appropriate trial strategy to neither call Washington as a witness nor pursue this avenue of defense with other witnesses. Detective Landando testified to Washington's denial at the postconviction hearing.

¶ 59    The circuit court analyzed the postconviction testimony from the witnesses who were implicating Washington through statements he allegedly made under the three remaining *Chambers* criteria and found that Buchholz did not provide ineffective assistance at trial where the testimony of Tiggs, Evans and Sapp would not qualify for admission under *Chambers* because the court could not find the requisite "considerable assurance" of trustworthiness that Washington actually made these statements. *People v. Anderson*, 367 Ill. App. 3d 653, 668-69 (2006). Washington's alleged statements would not qualify for admission at any retrial for the same reason.

¶ 60    Kenneith Jones is also attempting to establish a claim of actual innocence based on alleged newly discovered evidence in the form of the same witnesses' testimony regarding statements Washington allegedly made following the murder and before trial. Newly discovered evidence in support of a defendant's innocence is a cognizable postconviction petition claim as a matter of Illinois constitutional justice. *People v. Johnson*, 205 Ill. 2d 381, 392 (2002); see *People v. Washington*, 171 Ill. 2d 475 (1996). However, our supreme court has cautioned that the newly discovered evidence must, in fact, be new, material, noncumulative and so conclusive that it would probably change the result at trial. *People v. Johnson*, 205 Ill. 2d 381, 392 (2002). Newly discovered evidence is defined as " 'evidence that was unavailable at trial and could not have been discovered sooner through due diligence.' " *People v. Snow*, 2012 IL App (4th) 110415, ¶ 21 (quoting *People v. Harris*, 206 Ill. 2d 293, 301 (2002)). Evidence is not deemed newly discovered evidence when the petition " 'presents facts already known to a defendant at or prior to trial, though the source of these facts may have been unknown, unavailable or uncooperative.' " *People v. Snow*, 2012 Il App (4th) 110415, ¶ 21 (quoting *People v. Collier*, 387 Ill. App. 3d 630, 637 (2008)). Clearly, the statements attributed to Washington are neither new nor conclusive where Buchholz was aware of them and the postconviction court found they were not trustworthy.

¶ 61    Additional witnesses testified at the postconviction hearing to attempt to buttress the alibi defense presented at defendant's criminal trial. That portion of the testimony was cumulative and could have been discovered sooner. *People v. Harris*, 206 Ill. 2d 293 (2002) (affirmed the dismissal of the claim of actual innocence without an evidentiary hearing). In any event, the additional alibi information and the remaining portion of the witnesses' testimony were

held by the postconviction court to be contradictory to each other and to the testimony at trial. Additionally, at least two of the witnesses, Evans and Tiggs, provided affidavits that did not match their in-court testimony. Defendant's criminal trial attorney, Buchholz, testified that he chose not to call any additional alibi witnesses during the criminal trial after the initial alibi witnesses had discrepancies and did poorly on the witness stand. Further, Derrick Brooks, a witness at the scene of the murder who testified during the criminal trial, stated that he knew Washington and Washington was not one of the two gunmen who were shooting the night Shekena Waltower was murdered. Additionally, Brooks testified that he submitted a statement to defendant's trial attorney that exonerated defendant because he was made to believe by defendant's friends that if he did not do so they would retaliate against him. For all the foregoing reasons, the trial court properly ruled that the testimony from the various postconviction witnesses was unreliable and certainly not of such a conclusive character that it would probably result in a different outcome at retrial.

¶ 62                    D. Recantation Testimony of Eyewitness

¶ 63     Generally, a witness's recantation of his or her prior testimony is viewed as inherently unreliable. *People v. Steidl*, 177 Ill. 2d 239, 260 (1997). A court should not grant a new trial on that basis except in extraordinary circumstances. *People v. Steidl*, 177 Ill. 2d at 260; see also *People v. Caldwell*, 218 Ill. App. 3d 1007, 1010 (1991); *People v. Nash*, 36 Ill. 2d 275, 284 (1966). Most importantly for the instant case, recantation evidence, standing alone, does not rise to the level of a constitutional violation that would entitle a convicted person to a postconviction evidentiary hearing, let alone postconviction relief. *People v. Brown*, 169 Ill. 2d 94, 106 (1995); *People v. Steidl*, 177 Ill. 2d at 260; *People v. Caldwell*, 218 Ill. App. 3d 1007 (1991). Our supreme court has long reasoned that "[i]n the absence of an allegation of the knowing use of false testimony, or at least some lack of diligence on the part of the State, there [is] no involvement by the State in the false testimony to establish a violation of due process. [Citation.] Without such involvement, the action of a witness falsely testifying is an action of a private individual for which there is no remedy under the due process clause." *People v. Brown*, 169 Ill. 2d at 106. Because defendant cannot establish any due process violation, he is not entitled to relief based on Pia Easley's postconviction testimony that, years later, she is simply no longer sure that defendant was one of the gunmen who murdered Shekena Waltower. In any event, even without Pia's eyewitness account, there were other eyewitnesses who identified defendant at his criminal trial, including one, Antojuan Chew, who had known defendant since grammar school.

¶ 64                    E. The Defendant's Alleged *Brady* Violation Claim

¶ 65     Pursuant to the due process clause of the fourteenth amendment, the State must disclose to the defense any exculpatory evidence, including information that could be used to impeach a witness. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). *Brady* requires that if the State does not disclose evidence, the nontendered evidence must be both favorable to the accused and material before relief can be allowed. Favorable evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the

-15-

proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985).

¶ 66       The recanting eyewitness, Pia Easley, testified at the postconviction hearing that when she met with the prosecutor she related her uncertainty as to the identity of Kenneith Jones as one of the gunmen, but chose Jones because she was told by police at the lineup that she must choose two people. Defendant argues that his trial counsel was never informed that Pia Easley was uncertain about her identification and submits that the State's failure to disclose exculpatory information concerning Pia Easley was a *Brady* violation that should result in a new trial. Despite Pia Easley's belated claim, Detective Mason testified that he never told Pia she had to identify two people at the lineup, that Pia never expressed doubt as to her identification of the defendant as the gunman and never tentatively identified the defendant based only on build. He unequivocally stated that Pia's identifications of the two gunmen at the lineup were positive. In her second, amended affidavit, Pia Easlely averred that she told the prosecutor that she was sure Kenneith Jones was one of the gunmen. Given the differing versions of Pia Easley's accounts of events contained in her two affidavits, her trial testimony and her postconviction hearing testimony, the trial court was well within its discretion to reject the *Brady* violation claim that was based entirely on her postconviction testimony, which lacked credibility and was rebutted by other testimony at the hearing. In any event, the court determined that Pia Easley's now-professed uncertainty regarding her trial testimony was not of such strength that it would probably have changed the trial outcome. Defendant was adequately identified by other eyewitnesses at trial and a 13-year-old girl's fleeting doubt, even if it was expressed to the State, would be insufficiently material to bring about a different outcome at trial.

¶ 67                         F. Allegation of Ineffective Assistance of Counsel

¶ 68       In Illinois, claims of ineffective assistance of trial counsel are judged by the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1986). *People v. Coleman*, 183 Ill. 2d at 397. In order to prevail on his claim, defendant must first establish that his trial attorney's performance was deficient in that "counsel made errors so serious that counsel was not functioning as 'counsel' guaranteed defendant by the Sixth Amendment." (Internal quotation marks omitted.) *People v. Coleman*, 183 Ill. 2d at 397. There is a strong presumption that the action or inaction by a trial attorney was the product of sound trial strategy and not incompetence. *People v. Coleman*, 183 Ill. 2d at 397 (citing *People v. Barrow*, 133 Ill. 2d 226, 247 (1989)).

¶ 69       In this case, there is a claim that trial counsel failed to adequately investigate the alibi defense and this precluded him from calling Willie Evans, Frankie Summers and Errick Tiggs in defendant's criminal trial. This was rebutted by defendant's attorney's postconviction testimony and others. Defendant's trial attorney testified at the postconviction hearing to both his pretrial actions and his trial strategy which evolved as the trial unfolded. He personally interviewed several of the prosecution's witnesses, including the eyewitness, Sonia Easley. He attempted to interview 13-year-old eyewitness Pia Easley, but was prevented from doing so by her mother, Sonia. He interviewed all 19 witnesses identified by defendant's mother. He also spoke with Evans and Tiggs, who failed to ever tell him about

Washington's alleged statements implicating him in the murder. He personally interviewed Dwight Washington in jail.

¶ 70    Buchholz testified that he reviewed every criminal report, all statements, the lineup procedure and identifications, the grand jury testimony and other test results. He developed a trial strategy of attacking the personal identifications and presenting the alibi witnesses. Baugh was not interviewed as no one present at the scene ever identified Baugh as being present. In any event, the postconviction court found Baugh, a convicted murderer, and his postconviction testimony incredible as it contradicted ballistics evidence and photos of the murder scene. The alibi witnesses at the evidentiary hearing contradicted themselves and others who were called and not called at trial. Defendant's trial attorney made a reasonable strategic decision not to call more alibi witnesses. Additionally, the postconviction court's ruling excluding the affidavit of Buchholz's personal opinion regarding his client's innocence was a proper one. If the shoe were on the other foot, and Buchholz had prepared an affidavit stating he firmly believed his client was guilty, it would have been met with the identical objection the State made and would have been equally inadmissible. It is axiomatic that in our system of justice, it is the trier of fact who resolves factual disputes and determines whether the State has proven its case beyond a reasonable doubt.

¶ 71    We hold that defense counsel's performance met the objective standard of reasonableness. *People v. Manning*, 241 Ill. 2d 319, 326 (2011). We cannot find one instance where defense counsel was deficient in his defense, let alone an instance where any claimed deficiency prejudiced the defendant. *Manning*, 241 Ill. 2d at 326. In any event, prejudice can only be shown when there is a reasonable probability that, but for defense counsel's unprofessional errors, the outcome of the trial would have been different. *Manning*, 241 Ill. 2d at 326. Given the State's strong case involving independent eyewitnesses, there was no such reasonable probability of a different outcome other than a conviction.

¶ 72    For all of these above reasons, defendant has failed to meet his burden of demonstrating he had received ineffective assistance of counsel.

¶ 73                              VI. Conclusion

¶ 74    Far from being manifestly erroneous, the trial judge's final decision dismissing the defendant's postconviction petition following a full evidentiary hearing was strongly supported by the admissible evidence and was legally proper. Therefore, we affirm the circuit court's order dismissing the postconviction petition.

¶ 75    Affirmed.