2022 IL App (1st) 210405-U

No. 1-21-0405

Third Division
November 30, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT
_____

|  |  |  |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| | ) | No. 94 CR 8733 04 |
| v. | ) ) | |
| | ) | The Honorable |
| SHONDELL WALKER, | ) ) | Mary Margaret Brosnahan, |
| | ) | Judge Presiding. |
| Defendant-Appellant. | ) ) | |

_____

JUSTICE REYES delivered the judgment of the court.
Justices Gordon and Burke concurred in the judgment.

**ORDER**

¶ 1        *Held:*   The circuit court's dismissal of defendant's successive postconviction petition after a third-stage evidentiary hearing is affirmed where (1) the circuit court's findings as to the credibility of the witnesses were not against the manifest weight of the evidence and (2) the circuit court did not abuse its discretion in denying defendant's request to testify at the hearing.

¶ 2        In 1994, after a jury trial, defendant Shondell Walker was convicted of first-degree murder and sentenced to 70 years in the Illinois Department of Corrections (IDOC) for his role in the beating death of victim Steven Green. Defendant's conviction was affirmed on direct appeal

(*People v. Walker*, No. 1-96-0636 (1996) (unpublished order under Illinois Supreme Court Rule 23)), as was the first-stage dismissal of a *pro se* postconviction petition filed by defendant in 1998 (*People v. Walker*, No. 1-98-1836 (1999) (unpublished order under Illinois Supreme Court Rule 23)).

¶ 3        In 1999, defendant filed a successive postconviction petition, which alleged a number of trial errors as well as ineffective assistance of appellate counsel. The petition was dismissed at the second stage, and defendant appealed. On appeal, we considered whether two affidavits attached to the petition constituted newly discovered evidence in support of a claim of actual innocence. Ultimately, we found the affidavits to be cumulative of the evidence presented at trial, and affirmed the dismissal of the petition. *People v. Walker*, No. 1-02-1320 (2005) (unpublished order under Illinois Supreme Court Rule 23). Our supreme court, however, entered a supervisory order vacating our decision and remanding the matter to the circuit court so that defendant's counsel could comply with Rule 651(c) (Ill. S. Ct. R. 651(c) (eff. Dec. 1, 1984)). *People v. Walker*, 223 Ill. 2d 678 (2007).

¶ 4        On remand, defense counsel filed an amended Rule 651(c) certificate, stating that she was adopting defendant's previously filed *pro se* pleadings, along with "additional [a]ffidavits," including four new affidavits. The State again filed a motion to dismiss the petition, and the circuit court dismissed the petition at the second stage, finding that defendant had failed to make a substantial showing that newly discovered evidence established his actual innocence. Defendant appealed, and we reversed, finding that two of the affidavits were sufficient to warrant a third-stage evidentiary hearing. *People v. Walker*, 2016 IL App (1st) 132875-U. The matter then proceeded to an evidentiary hearing, where the two witnesses testified. The circuit court ultimately found their testimony not credible, however, and dismissed defendant's

petition. Defendant now appeals, contending that (1) the circuit court's findings were against the manifest weight of the evidence and (2) the circuit court abused its discretion in refusing to permit defendant to testify at the evidentiary hearing. For the following reasons, we affirm the circuit court's dismissal of defendant's successive postconviction petition.

¶ 5                                                    BACKGROUND

¶ 6        As noted, the instant case has a long history, including four prior appeals before this court. A detailed recitation of the facts underlying defendant's conviction and his prior appeals is contained in our most recent decision from 2016. See *Walker*, 2016 IL App (1st) 132875-U, ¶¶ 6-36. We repeat here only those facts necessary to an understanding of the issues raised on this appeal.

¶ 7                                                       *Trial*

¶ 8        The evidence at trial established that on January 23, 1994, a mandatory meeting of the Black Disciples street gang was held at the apartment of Sheila Crosby (Crosby). At the meeting, 25 to 30 gang members gathered in a circle and five gang members pulled the victim into the middle of the circle. The five gang members—allegedly including defendant—then proceeded to beat the victim for several minutes with their fists, baseball bats, and a table leg. The victim was later transported to a vehicle, which defendant drove to the hospital, but the victim ultimately died from his injuries. Defendant and seven other individuals were indicted for first-degree murder, and defendant and a codefendant, Anthony Jaynes (Jaynes), were tried simultaneously before separate juries.

¶ 9        At trial, the State presented the testimony of a number of witnesses, including two occurrence witnesses: Michael Sardin (Sardin) and Crosby. Defendant did not present any evidence on his own behalf.

¶ 10                                         Michael Sardin

¶ 11          Sardin testified that defendant was the chief of security for three buildings run by the Black Disciples in the area and informed Sardin about the meeting. When Sardin arrived at the apartment, he observed 25 to 30 gang members in attendance, including defendant. The gang members formed a circle and the gang "coordinator" called the victim to the center of the circle. He then called five other gang members, including defendant, into the middle of the circle. He informed the victim that he was "bogus" for selling drugs and instructed the gang members he had selected to avoid hitting the victim in the head or face. The gang members then proceeded to beat the victim for one minute, changed positions, then resumed beating the victim for an additional two minutes.

¶ 12          Defendant then instructed Sardin to leave and perform security duties, meaning that he was to stand in the back of the building and keep a lookout. As Sardin left the apartment, he heard the victim yelling. Approximately 35 minutes later, Sardin observed defendant and another gang member holding the victim up as they walked him out of the building. They then placed the victim into the back seat of a vehicle owned by defendant's girlfriend and defendant drove away.

¶ 13          Sardin testified that he did not voluntarily come forward with this information to the police. Instead, he was arrested on February 16, 1994, and was questioned about the victim's death. At that time, Sardin identified four people, including defendant, in a photo array as having participated in the beating of the victim. Sardin also identified the victim and the vehicle defendant was driving that evening from a photo array. Sardin later similarly testified in a grand jury proceeding that defendant had participated in the beating death of the victim.

¶ 14　　　　On April 21, 1995, Sardin signed a written statement in which he recanted his prior statements to the police and the grand jury, claiming that the police had beaten Sardin so that he would testify against defendant at the grand jury proceeding and that he did not actually observe what had happened to the victim. Sardin testified that he signed this statement in his apartment in the presence of an attorney for one of the codefendants, an investigator, and his grandmother. Sardin testified that the reason he signed the statement was that he was "scared," as several days earlier, the gang coordinator had threatened to kill Sardin if he testified.

¶ 15　　　　Sardin further testified that, shortly before the trial, one of the gang members had shot him in the neck and, after the shooting, he hid in a gangway and ran home, where his family called for an ambulance. Sardin thereafter failed to respond to a subpoena due to fright, but the police took him into custody to ensure his appearance at trial. As of the date of trial, Sardin was placed in a witness protection program.

¶ 16　　　　　　　　　　　　　　　　Sheila Crosby

¶ 17　　　　Before the grand jury, Sheila Crosby testified that on January 23, 1994, she had observed defendant walking with the victim to her apartment before the beating. Crosby was moved to her bedroom by a gang member during the meeting, but she "looked out" her bedroom door several times and observed gang members "violating" the victim. Crosby testified that she observed the gang members, including defendant, beating and kicking the victim. After the victim was removed from the apartment by defendant and two other gang members, one of the codefendants returned to the apartment to retrieve the bats, sticks, and table leg that had been used to beat the victim. She was also warned that she "don't know nothing" and "didn't see nothing."

¶ 18      At trial, Crosby testified and recanted her grand jury testimony. Crosby testified that she observed 10 to 12 young men in her apartment, but was unaware if they were gang members. Defendant was not present in her apartment, and she did not know whether he was a gang member. Crosby testified that the police had instructed her what to say at the grand jury proceedings, and that she had followed their instructions based on her fear that her children would be taken away by the Department of Children and Family Services if she went to jail.

¶ 19      Crosby was impeached with her grand jury testimony, and further testified that following her original statements to the police and the grand jury, she was placed in a witness protection program to protect her from gang retaliation. These efforts, however, failed when gang members found Crosby and informed her that she had to return to her apartment so they could "watch" her.

¶ 20      Crosby also testified that a month prior to trial, she was stopped by four Black Disciple gang members, who attacked her, resulting in 15 stitches. Crosby testified that she had been attacked because the gang members did not want her to testify at trial, and identified an individual sitting in the courtroom as one of her assailants. Crosby testified that, although she was afraid to testify, she was "going to tell the truth." On cross-examination, Crosby testified that she did not believe that the gang members were concerned about her testifying against defendant or Jaynes but that "there's some other ones they don't want me to testify against."

¶ 21      After hearing closing arguments, the jury found defendant guilty of first-degree murder. After a sentencing hearing, the circuit court imposed an extended-term sentence of 70 years in the IDOC, based on a finding that the offense was brutal and heinous.

¶ 22                                    *Direct Appeal*

¶ 23        On direct appeal, defendant claimed that (1) the State improperly "capitalized on the non-existent connection" between defendant and the individuals who had beaten and threatened Crosby and Sardin, and (2) defendant was denied a fair trial where the circuit court failed to inquire whether a juror was adversely influenced after another juror was excused due to fear. The circuit court's judgment was affirmed on appeal. *Walker*, No. 1-96-0636. Defendant filed a petition for leave to appeal in the Illinois Supreme Court, which was denied.

¶ 24                            *Initial Postconviction Petition*

¶ 25        In 1998, defendant filed a *pro se* petition for postconviction relief, alleging that the circuit court abused its discretion where the prosecutors used perjured testimony at trial and defendant was denied effective assistance of counsel. The circuit court dismissed the petition at the first stage, and defendant appealed. On appeal, this court granted the State Appellate Defender's motion to withdraw pursuant to *Pennsylvania v. Finley*, 481 U.S. 551 (1987), found no issues of arguable merit, and affirmed the circuit court's dismissal. *Walker*, No. 1-98-1836.

¶ 26                          *Successive Postconviction Petition*

¶ 27        In April 1999, defendant filed a second *pro se* postconviction petition, alleging (1) the State used perjured testimony at trial, (2) trial counsel was ineffective for failing to call certain witnesses and tender certain jury instructions, denying defendant his right to testify, and failing to raise in the motion for a new trial the issue of other-crimes evidence, (3) defendant was denied a fair trial where the circuit court refused to grant a mistrial where a fearful juror may have expressed fear to other jurors, (4) appellate counsel was ineffective for failing to challenge defendant's sentence as unconstitutional, (5) there were "[illegal] search and seizures," and (6)

defendant's sentence was an abuse of discretion and constitutionally disparate from his codefendants.

¶ 28    In November 1999, a public defender was appointed to represent defendant. The State then filed a motion to dismiss the petition based on untimeliness. In response, defendant's counsel claimed that any timeliness requirements should be relaxed, as (1) newly discovered evidence supported a claim of actual innocence and (2) the recently decided case of *Apprendi v. New Jersey*, 530 U.S. 466 (2000), established that defendant's sentence was unconstitutional. Defense counsel also filed a supplemental postconviction petition, in which defendant alleged that he was sentenced to an extended-term sentence when the additional factors supporting the sentence were not proven beyond a reasonable doubt before a jury, in violation of *Apprendi*.

¶ 29    In support of his actual-innocence claims, defendant attached two affidavits from Sardin. In both, Sardin recanted his trial testimony. In the first affidavit, dated November 19, 1998, Sardin averred that he had not been present for the victim's beating. Sardin averred that he had lied during Jaynes' trial when he testified that he had observed Jaynes beating the victim at the meeting, and that he was informed by the assistant State's Attorney that he would be jailed for contempt or charged with the victim's murder if he recanted his grand jury testimony. Sardin also averred that he was not threatened by gang members to recant his grand jury testimony and that the only threats he received were from detectives and the assistant State's Attorneys.

¶ 30    In his second affidavit, dated March 14, 2000, Sardin averred that he had testified against defendant at trial due to the detectives and assistant State's Attorneys threatening that he would be convicted for the victim's murder if he did not testify. Sardin reiterated that the only threats he received were from the detectives and the assistant State's Attorneys.

¶ 31        The State filed a motion to dismiss the supplemental petition, claiming that defendant's *Apprendi* claim failed as *Apprendi* did not apply retroactively. In 2002, the circuit court granted the State's motion to dismiss the supplemental petition on the basis of timeliness.

¶ 32        Defendant appealed the dismissal of his petition, claiming (1) his public defender failed to file a certificate that fully complied with Rule 651(c) and (2) Sardin's two affidavits constituted newly discovered evidence of his actual innocence. With respect to defendant's actual-innocence claim, we found that Sardin's affidavits were cumulative of his written recantation which was presented at trial, and further found that the public defender's failure to file a Rule 651(c) certificate was harmless error. Accordingly, we affirmed the circuit court's judgment dismissing the petition. *Walker*, No. 1-02-1320.

¶ 33        In 2007, our supreme court denied defendant's petition for leave to appeal but entered a supervisory order vacating our decision and remanding the matter to the circuit court so that defendant's counsel could comply with Rule 651(c). *Walker*, 223 Ill. 2d 678.

¶ 34                                              *First Remand*

¶ 35        In 2012, defense counsel filed an amended certificate pursuant to Rule 651(c), stating that she was adopting defendant's previously-filed *pro se* petition along with "additional [a]ffidavits." The State filed a motion to dismiss, and defendant filed a response claiming that the additional affidavits required an evidentiary hearing.

¶ 36        The affidavits at issue were from (1) defendant, (2) Sardin, (3) codefendant Anthony Horton (Horton),[1] and (4) Duval Walker (Duval).[2] In defendant's affidavit, he averred that he

---

[1] Horton was charged along with defendant and is serving a 35-year sentence in the IDOC.
[2] Duval is also referred to as Duvall Walker and Duval Washington in the record on appeal. Duval was charged in a separate indictment with the victim's murder, and was convicted under a theory of accountability and received a 23-year sentence. According to his testimony at the evidentiary hearing, Duval was released in 2006.

9

did not participate in the beating. In Sardin's affidavit, unlike his two previous affidavits, Sardin averred that he was present at the beating of the victim and that defendant did not participate in the beating.

¶ 37    In Horton's affidavit, he averred that he was present at the beating of the victim and that defendant did not participate in the "violation" of the victim. Instead, defendant's only involvement in the incident was assisting the victim to the hospital. Horton averred that, although he was not involved in the beating, Horton subsequently fled to Louisiana "to avoid jail time." Horton averred that he was "only making this statement because I know that [defendant] did not hit nor kick [the victim] as they say he did, because I was there during the infraction."

¶ 38    In Duval's affidavit, which was in the form of a printed document with handwritten additions, Duval averred that he was defendant's brother and that, while Duval participated in the beating, defendant did not participate and was not involved. Duval averred that defendant did not know anything about the crime and that he was "saying something now because I [felt] guilty because he had nothing to do with it."

¶ 39    On August 29, 2013, the circuit court granted the State's motion to dismiss defendant's petition. In a 13-page order, the circuit court addressed all of defendant's claims from his prior *pro se* and supplemental petitions, as well as the actual-innocence claim based on Duval's and Horton's affidavits. With respect to the actual-innocence claim, the circuit court found that defendant had failed to make a substantial showing that newly discovered evidence established his actual innocence.

¶ 40    Defendant appealed the dismissal, contending that the circuit court erred in dismissing his petition without an evidentiary hearing where the affidavits of Horton and Duval constituted

newly discovered evidence that would change the result on retrial. On appeal, we found that the testimony of Horton and Duval was newly discovered evidence, as both men were charged with the murder of the victim and could not have been forced to violate their Fifth Amendment rights to avoid self-incrimination by testifying on defendant's behalf during trial. *Walker*, 2016 IL App (1st) 132875-U, ¶ 71. We further found that the new evidence was material and noncumulative, as the two men indicated that they were present for or involved in the victim's beating but that defendant did not participate in the attack and only assisted the victim to the hospital. *Id.* These statements directly contradicted the original statements of Sardin and Crosby that defendant participated in the beating and were not cumulative to either Crosby's recantation that defendant was not present at the beating or Sardin's prior recantations that he did not witness the beating. *Id.* Instead, we found that "the evidence in the affidavits goes to the ultimate issue in the case, *i.e.*, who participated in the beating death of the victim, and if taken as true, would produce new questions to be considered by the trier of fact regarding defendant's guilt. [Citation.]" (Internal quotation marks omitted.) *Id.*

¶ 41     We then considered whether Horton's and Duval's affidavits were sufficiently conclusive to probably change the result on retrial. We noted that "the State's case against defendant is arguably tenuous," as the evidence provided against defendant was comprised solely of eyewitness testimony provided by Sardin and Crosby which had since been recanted. *Id.* ¶ 73. There was no physical evidence, and "the State's evidence in this regard is not overwhelming." *Id.* We further noted that, even if we found Sardin's and Crosby's recantations incredible, the new affidavits directly contradicted their original statements as to defendant's participation in the beating. *Id.* Accordingly, "at retrial, even if Sardin's and Crosby's recantations are found not credible, the affidavits of Horton and Duval would cast a shadow on Sardin's and Crosby's

original statements and corroborate their recantations at retrial." *Id.* We therefore found that, at this stage of the proceedings, "the affidavits provided by Horton and Duval, together with the evidence presented at trial, place the evidence presented by the State in a new light and undercuts our confidence in the factual correctness of defendant's verdict." *Id.* We remanded the case to the circuit court for a third-stage evidentiary hearing on the issue of actual innocence. *Id.* ¶ 74.

¶ 42                                     *Second Remand*

¶ 43        Upon remand, the circuit court conducted an evidentiary hearing on the issue of actual innocence.

¶ 44                                        Duval

¶ 45        Duval testified that defendant was his younger brother, and that Duval was involved in the events occurring on January 23, 1994. Duval was responsible for locating the victim and bringing him to Crosby's apartment, but initially returned with the wrong "Steven Green." When the correct "Steven Green" arrived at the apartment, Duval was instructed to stand in front of Crosby's bedroom door as security. Duval testified that he was unaware that the victim was going to be "violated." Duval stood in front of the door for approximately 30 minutes, and did not observe defendant there during that time. Duval testified that he never spoke to defendant, and that defendant was not present at all. After the meeting, everyone went downstairs and spread out. Duval observed defendant standing outside near the back of the building for approximately 15 to 20 minutes. After that time, Duval observed defendant taking the victim to a vehicle in order to drive him to the hospital.

¶ 46        On cross-examination, Duval testified that he was charged in the victim's death and was found guilty after a bench trial in 1997 and was sentenced to 23 years in the IDOC; he was

released in 2006. Duval further testified that both he and defendant were members of the Black Disciples street gang at the time of the beating. Duval did not hold a rank in the gang, and testified that he was unaware that defendant served as chief of security for three buildings. Duval testified that there were over 20 people at the meeting, and that it was a mandatory meeting. Duval was aware that the victim was going to be "violated," as usually occurred at such meetings. Duval had been violated in the past, and had been beaten so severely that he was unable to sell drugs for two weeks.

¶ 47    Duval testified that, at his trial, the theory of his defense was that he was merely present inside the apartment as security and did not participate in the beating. In the affidavit submitted in support of defendant's petition, however, Duval averred that he participated in the beating. When asked about the contradiction, Duval testified that the affidavit was inaccurate and that he did "[n]ot really" read the affidavit before signing it. Duval further testified that he received the affidavit in the mail and someone assisted him in completing it.

¶ 48    Duval testified that, after his trial, he filed a handwritten motion for a new trial in which he claimed that his trial counsel was ineffective for failing to call potential witnesses, including alibi witnesses. Duval, however, testified that he was unaware of what an "alibi witness" was.

¶ 49                                    Horton

¶ 50    When he took the stand, Horton indicated that he "want[ed] to stand by what's in the affidavit" but did not want to testify as he did not wish to endanger his family.

¶ 51    On cross-examination, Horton testified that, at his trial, he had testified that he was a member of the Black Disciples at the time of the victim's beating. Horton was treasurer, and defendant was chief of security for three buildings. Horton was present at the time of the victim's beating, as was defendant. Neither Horton nor defendant participated in the beating,

13

however, as both were in the kitchen. Horton testified that he was found guilty after a bench trial and was sentenced to 35 years in the IDOC.

¶ 52                                    Other Evidence

¶ 53        After Duval and Horton testified, the State entered the appellate records, including the trial transcripts, for both men into evidence.[3] The defense also entered into evidence the affidavits of both Duval and Horton.

¶ 54        After the attorneys presented argument, defendant raised his hand and the circuit court allowed him to speak. Defendant first indicated that he did not wish to come back into the courtroom again, as he was claustrophobic and had panic attacks that were exacerbated by being in shackles. After the circuit court assured defendant that his presence was not required if he chose not to attend and asked if there was anything else he wished to say to the court, defendant added that "I wanted to take the stand. I [have] been crying for 26 years and my story has not been out there. I [have] been incarcerated for 26 years for something I didn't do."

¶ 55        The circuit court stated that it was going to take a recess to allow defendant to speak with his attorney. While arguments had concluded, the circuit court noted that "[i]t's a bench proceeding. So you want to re-open to do that, you know, I would allow that." After the recess, however, the circuit court indicated that it was going to review the petition that was originally considered by the appellate court to determine if defendant would be allowed to testify. The court noted that this was not a bench trial "where you have the right to call whoever you want whenever you want." Instead, the current proceeding was based on the content of previous

_____

[3] Duval's appellate record was immediately entered into evidence, but the State had not received the entire appellate record for Horton as of the date of the hearing, so Horton's appellate record was admitted into evidence at a later date.

filings, so the circuit court needed to review those filings to determine whether defendant's testimony was appropriate.

¶ 56    After another recess, the circuit court stated:

"Obviously we're governed by the post-conviction pleading statutes, what the State's been put on notice what was filed, what evidence was submitted for purposes of actual innocence, so unless there's some proffer that you can make to the Court, based upon my review of the order and what's previously been filed I don't find anything would be relevant as to actual innocence with respect to your client's testimony."

In response, defendant's counsel claimed that defendant's petition, as well as the supplemental one filed by counsel, included allegations of ineffective assistance of counsel, including allegations that defendant was not permitted to testify at trial. The State, however, responded that "[t]he remand specifically says actual innocence with regards to these two affidavits only. Everything else was affirmed so it doesn't matter honestly what was in his petition. It's not part of this case, part of this remand."

¶ 57    After reviewing its prior order and the appellate court decision, the circuit court determined that only the actual-innocence claim was before it on remand and, therefore, it would not permit defendant to testify.

¶ 58                                    Order

¶ 59    On April 5, 2021, the circuit court issued a 19-page written order dismissing defendant's petition. The circuit court indicated that it had considered "testimony presented at the post-conviction hearing, transcripts of the trial proceedings, the common law record, and the orders of the appellate court in earlier appeals" in reaching its decision. The circuit court found that

15

Duval's and Horton's testimony was newly discovered evidence but was not of such a conclusive character that it would probably change the result on retrial. The circuit court further found that, "[i]n large part, the court finds that [Duval's] and Horton's testimony lacked credibility and do not support an actual innocence claim."

¶ 60    As to Duval, the circuit court noted that he claimed that he received an affidavit in the mail and merely signed it. The affidavit, however, stated that he actually participated in the beating. After his trial, Duval filed a motion for new trial, where he alleged that his counsel was ineffective for failing to call potential witnesses, including alibi witnesses. Finally, Duval testified at the evidentiary hearing that he served as security and was unaware whether the victim was even violated, and only observed defendant—his brother—outside after the meeting was over. The circuit court concluded that "[t]his court finds [Duval's] testimony to be inconsistent, self-serving and incredible."

¶ 61    As to Horton, the circuit court noted that at the evidentiary hearing, Horton "outright state[d] that he was not even aware that a violation was taking place," despite being a treasurer for the gang and having been a gang member since he was 14 years old. During his trial, however, Horton testified that he was present during the violation but decided to remain in the kitchen, and further testified that he was aware that the victim was receiving a violation for stealing cocaine. The circuit court concluded that "[t]his court also finds Horton's testimony to be incredible and inconsistent."

¶ 62    The circuit court found that the jurors at defendant's trial had the opportunity to assess the credibility of the witnesses that testified at trial, including observing their demeanor, testimony, and evidence. The circuit court "examined the new evidence in light of the old testimony and determines that a new trial is not warranted." Accordingly, the circuit court found that

defendant had failed to demonstrate a substantial denial of a constitutional right by a preponderance of the evidence and dismissed defendant's petition.

¶ 63        This appeal follows.

¶ 64                                ANALYSIS

¶ 65        On appeal, defendant contends that (1) the circuit court's findings were against the manifest weight of the evidence and (2) the circuit court abused its discretion in refusing to permit defendant to testify at the evidentiary hearing.

¶ 66                        *Post-Conviction Hearing Act*

¶ 67        The Post-Conviction Hearing Act (Act) provides a framework for incarcerated individuals to collaterally attack their convictions by establishing the substantial denial of a constitutional right during trial or sentencing. 725 ILCS 5/122-1(a)(1) (West 2018). Claims are limited to those that were not and could not have been previously litigated. *People v. Petrenko*, 237 Ill. 2d 490, 499 (2010). Proceedings under the Act occur in three stages. *People v. Gaultney*, 174 Ill. 2d 410, 418 (1996). At the first stage, the circuit court determines whether a petition is frivolous or patently without merit. *Id.*; 725 ILCS 5/122-2.1(a)(2) (West 2018). At the second stage, the court may appoint counsel to represent an indigent defendant and, if necessary, to file an amended petition; at this stage, the State must either move to dismiss or answer the petition. *Gaultney*, 174 Ill. 2d at 418; 725 ILCS 5/122-4, 122-5 (West 2018). Only if the petition and accompanying documentation make a substantial showing of a constitutional violation will the defendant proceed to the third stage, an evidentiary hearing on the merits. *People v. Silagy*, 116 Ill. 2d 357, 365 (1987); 725 ILCS 5/122-6 (West 2018).

¶ 68        Generally, the Act contemplates the filing of only one petition. 725 ILCS 5/122-1(f) (West 2018). Successive petitions are disfavored and, therefore, in order to proceed, a petitioner must

first obtain leave of court by either asserting actual innocence or satisfying the cause-and-prejudice test.[4] *People v. Wilson*, 2014 IL App (1st) 113570, ¶ 33.

¶ 69                                    *Actual Innocence*

¶ 70    In order to succeed on a claim of actual innocence, a defendant must present "new, material, noncumulative evidence that is so conclusive it would probably change the result on retrial." *People v. Coleman*, 2013 IL 113307, ¶ 96 (citing *People v. Washington*, 171 Ill. 2d 475, 489 (1996)). "New" means that the evidence was discovered after trial and could not have been discovered earlier through the exercise of due diligence. *Id.* "Material" means that the evidence is relevant and probative of the defendant's innocence. *Id.* "Noncumulative" means that the evidence adds to what the jury heard. *Id.* "[C]onclusive" means that the evidence, when considered along with the trial evidence, would probably lead to a different result. *Id.*

¶ 71    In practice, a trial court will generally review the evidence presented at the evidentiary hearing in order to determine whether it was new, material, and noncumulative. *Id.* ¶ 97. If any of it is, "the trial court then must consider whether that evidence places the evidence presented at trial in a different light and undercuts the court's confidence in the factual correctness of the guilty verdict." *Id.* This analysis involves credibility determinations "that are uniquely appropriate for trial judges to make." *Id.* The trial court, however, should not redecide a defendant's guilt in deciding whether to grant relief. *Id.* "Probability, not certainty, is the key as the trial court in effect predicts what another jury would likely do, considering all the evidence, both new and old, together." *Id.*

---

[4] We note that our supreme court expressly held that the cause-and-prejudice test is the analytical tool to be used in determining whether to allow a successive postconviction petition in *People v. Pitsonbarger*, 205 Ill. 2d 444, 459 (2002), which was decided after the filing of defendant's successive postconviction petition in the instant case. As defendant is claiming actual innocence, however, the applicability of the cause-and-prejudice test is not relevant to the instant appeal.

¶ 72    We review a trial court's decision to deny relief following an evidentiary hearing for manifest error. *Id.* ¶ 98. Manifest error is "clearly evident, plain, and indisputable" and a decision is manifestly erroneous when the opposite conclusion is clearly evident. (Internal quotation marks omitted.) *Id.*

¶ 73    In this case, the circuit court found that Duval's and Horton's testimony constituted newly discovered evidence, but found that the evidence was not of such a conclusive character that it would probably change the result on retrial. Specifically, the circuit court found both men's testimony to be incredible and inconsistent. We cannot find that this decision was against the manifest weight of the evidence.

¶ 74    Defendant contends that the testimony of Sardin and Crosby was weak, given their later recantations, and so the testimony of Duval and Horton would probably result in a different outcome on retrial. Defendant is correct that both Sardin and Crosby recanted their testimony, and we noted in an earlier decision that the State's case against defendant was "arguably tenuous" in light of its reliance on their testimony. *Walker*, 2016 IL App (1st) 132875-U, ¶ 73. Those recantations, however, were known to the jurors and they were able to consider them in deciding the weight to place on each witness' testimony.[5] Defendant overlooks, additionally, the fact that Duval and Horton were also found by the circuit court to be problematic witnesses.

¶ 75    With respect to Duval, his affidavit provided that he participated in the beating. His testimony at the evidentiary hearing, however, indicated that Duval was merely present as security and did *not* participate in the beating; indeed, he testified that he was unaware of

---

[5] We note that, in his brief, defendant references Sardin's "multiple recantations," including his affidavits attached to defendant's successive postconviction petition. The question the circuit court was asked, however, was whether the evidence presented at the evidentiary hearing "places *the evidence presented at trial* in a different light." (Emphasis added.) *Coleman*, 2013 IL 113307, ¶ 97. Thus, the relevant evidence as to Sardin was (1) his grand jury testimony, (2) his recantation, and (3) his testimony at trial.

whether the victim was violated at all. He also filed a motion for new trial in his own case, in which he alleged that counsel was ineffective for failing to call alibi witnesses. We also must note, as the circuit court did, that Duval was not an uninterested witness, as defendant is his younger brother.

¶ 76    Defendant provides justifications for any inconsistencies, suggesting that Duval did not understand what he was signing or the documents he was filing. The fact is, however, that it is not our position to weigh the evidence or make decisions as to a witness' credibility. That is the purview of the circuit court, who had the ability to observe Duval in person. See *Coleman*, 2013 IL 113307, ¶ 97 (credibility determinations at a third-stage evidentiary hearing are "uniquely appropriate" for trial judges to make). We are in no position to determine whether Duval understood what he was signing or whether he was being untruthful at any point, and must defer to the circuit court's findings on the matter. Here, the circuit court clearly found Duval's testimony "to be inconsistent, self-serving and incredible." We can find no reason to second-guess this conclusion and accordingly cannot find that it was against the manifest weight of the evidence for the circuit court to find that such testimony would probably not lead to a different result on retrial.

¶ 77    With respect to Horton, in his affidavit, Horton indicated that he was not aware that the victim "would be put in harms [*sic*] way," despite the fact that he had been part of the gang since he was 14 years old and was a treasurer for the gang. Horton also testified at the evidentiary hearing that he was unaware of what was occurring in the apartment but averred in his affidavit that "I witnessed the violation" of the victim. During his trial, Horton testified that he was present during the violation and knew why the victim was being violated, but that he decided to remain in the kitchen after observing the victim being hit with a stick. Horton also

testified at his trial that he could not recall whether defendant was present at the violation, but testified at the hearing that defendant was in the kitchen with him. Thus, even if Horton's testimony about defendant being in the kitchen with him remained consistent, there were other inconsistent aspects of his testimony such that the circuit court could properly have found Horton's testimony to be "incredible and inconsistent." Accordingly, we cannot find that it was against the manifest weight of the evidence for the circuit court to determine that Horton's testimony was not likely to lead to a different result on retrial.

¶ 78    We are unpersuaded by defendant's contention that Duval's and Horton's testimony would "directly contradict[ ]" the trial testimony and corroborate Sardin's and Crosby's recantations. Duval's and Horton's testimony is not even consistent with each other: Duval testified that defendant was not present inside the apartment at all, while Horton testified that defendant was present inside the apartment but was in the kitchen during the time of the beating. As noted, their testimony at the evidentiary hearing was also inconsistent with their accounts set forth in their affidavits and at their trials. We therefore see no way that this additional testimony would serve to corroborate or contradict any evidence that was presented at trial. The jurors in the instant case heard several different versions of events, including recantations from the two main witnesses, and determined which version they believed. We cannot find that adding two more inconsistent versions of events would have a likelihood of changing the result on retrial and therefore affirm the circuit court's dismissal of defendant's petition.

¶ 79                                          *Defendant's Testimony*

¶ 80    Defendant also claims that the circuit court abused its discretion in refusing to permit him to testify at the evidentiary hearing. The rules of evidence are not abandoned during an evidentiary hearing on a postconviction petition, and whether or not evidence is admitted

21

during any hearing is within the discretion of the circuit court. *People v. Jones*, 2012 IL App (1st) 093180, ¶ 52. We will not reverse such a decision unless the circuit court abused its discretion. *Id.* An abuse of discretion occurs "only if the trial court's evidentiary rulings are 'arbitrary, fanciful or unreasonable' or when 'no reasonable [person] would take the view adopted by the trial court.' " *Id.* (quoting *People v. Donoho*, 204 Ill. 2d 159, 182 (2003)).

¶ 81 In this case, during the evidentiary hearing, after the attorneys had argued, defendant requested to address the court. Defendant indicated that he wished to testify, and the circuit court was initially inclined to allow him to do so. After reviewing this court's previous decision, however, the circuit court ultimately declined to permit defendant to testify, finding that the evidence at the hearing should be limited only to the testimony of Duval and Horton. We cannot find that this decision constituted an abuse of the circuit court's discretion.

¶ 82 Defendant is correct that at an evidentiary hearing, "[t]he court may receive proof by affidavits, depositions, oral testimony, or other evidence," and may order the petitioner brought before the court for the hearing. 725 ILCS 5/122-6 (West 2018). The court thus has "wide latitude" in the type of evidence it may consider. *People v. Ruiz*, 177 Ill. 2d 368, 383 (1997); *People v. Montgomery*, 162 Ill. 2d 109, 113 (1994). We cannot find, however, that the circuit court in this case was required to permit defendant to testify.

¶ 83 First, defendant appears to acknowledge that his affidavit, in which he proclaimed his innocence, does not constitute newly discovered evidence and therefore would not be sufficient to warrant a third-stage evidentiary hearing on its own. Indeed, in his prior appeal, defendant did not even raise his own affidavit in support of his actual-innocence claim but instead argued only about Duval's and Horton's affidavits. See *Walker*, 2016 IL App (1st) 132875-U, ¶ 66 ("Defendant argues he made a substantial showing of actual innocence *** because *the*

22

*affidavits of his codefendants Horton and Duval* establish he did not participate in the beating death of the victim." (Emphasis added.)). Defendant, however, contends that not all of the evidence presented at an evidentiary hearing must be "new" evidence and that "other evidence may be presented *in addition* to the new evidence" (emphasis in original) in order to support the claims made in the petition. Defendant cites no authority to support this proposition. Even if true, however, we cannot find that permitting defendant's testimony was required to support or corroborate either Duval's or Horton's accounts, as he claims. As noted, the circuit court found Duval's and Horton's testimony incredible and inconsistent, largely based on internal inconsistencies between their hearing testimony, their affidavits, and their own trial proceedings. Adding defendant's own account would not have changed these internal inconsistencies or made them less problematic.

¶ 84    Additionally, the circuit court was appropriately guided by our prior decision in determining the scope of the evidentiary hearing. Our decision was based entirely on an analysis of the affidavits of Duval and Horton. As noted, defendant did not even argue that his affidavit or Sardin's most recent affidavit, both of which were attached to his postconviction petition, warranted an evidentiary hearing. Instead, the only issue before us was whether Duval's and Horton's affidavits constituted newly discovered evidence sufficient to move the proceedings to a third-stage evidentiary hearing. We concluded they did, and remanded for such a hearing. There can be no question as to the scope of this decision—we specifically discussed "the affidavits of Horton and Duval" no fewer than 17 times in our analysis. At the hearing, then, the circuit court properly found that the issue was whether the testimony provided by Horton and Duval would likely change the result on retrial. We therefore can find

no abuse of discretion in the circuit court's decision to limit the testimony to those two witnesses.

¶ 85 Alternatively, defendant claims that postconviction counsel was ineffective for failing to make an offer of proof to inform the circuit court that defendant's testimony would go to the issue of his actual innocence. It is well established that there is no constitutional right to assistance of counsel during postconviction proceedings. *People v. Cotto*, 2016 IL 119006, ¶ 29. Our supreme court has, therefore, explained that the right to assistance of counsel in postconviction proceedings is " 'a matter of legislative grace' " and a defendant is guaranteed only the level of assistance provided by the Act. *Id.* (quoting *People v. Hardin*, 217 Ill. 2d 289, 299 (2005)). Our supreme court has further interpreted the Act as providing a postconviction petitioner with "reasonable" assistance. *Hardin*, 217 Ill. 2d at 299; see also *Cotto*, 2016 IL 119006, ¶ 30; *People v. Owens*, 139 Ill. 2d 351, 358-59 (1990).

¶ 86 In this case, we cannot find that postconviction counsel was ineffective for failing to make an offer of proof. As noted, the circuit court reasonably determined that its actual-innocence inquiry was limited to considering Duval's and Horton's testimony, so defendant's testimony would have been inappropriate to consider. Thus, if defendant's testimony would not have added anything to the court's determination as to Duval's and Horton's credibility, as explained above, the only way for defendant's testimony to be appropriate would have been if there was a pending claim for ineffective assistance of counsel centered on counsel's refusal to permit defendant to testify at trial. The circuit court therefore inquired whether such a claim remained pending, and counsel responded that it was not. Making an offer of proof as to the subject matter of defendant's testimony—namely, his assertion of actual innocence—would

not have made any difference. Accordingly, we cannot find that postconviction counsel was ineffective for failing to make an offer of proof.

¶ 87                                    CONCLUSION

¶ 88        For the reasons set forth above, we affirm the circuit court's dismissal of defendant's postconviction petition.

¶ 89        Affirmed.