NOTICE
Decision filed 10/19/23. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2023 IL App (5th) 210149-U

NO. 5-21-0149

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Madison County. |
| | ) | |
| v. | ) | No. 93-CF-1931 |
| | ) | |
| MICHAEL COLEMAN JR., | ) | Honorable |
| | ) | Neil T. Schroeder, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE McHANEY delivered the judgment of the court.
Justices Moore and Barberis concurred in the judgment.

**ORDER**

¶ 1     *Held*: Where the trial court did not abuse its discretion in denying the defendant's request for a continuance of the third stage successive postconviction hearing in order to locate and serve potential witnesses with subpoenas, or in denying the defendant's request to admit the affidavits of the witnesses into evidence, we affirm.

¶ 2     The defendant appeals from the trial court's denial of two motions immediately before the third stage evidentiary hearing on his successive postconviction petition. At issue is whether the trial court abused its discretion first by denying the defendant's request for a continuance to obtain the testimony of critical witnesses for his evidentiary hearing, and second by refusing to enter the sworn affidavits of these same witnesses into evidence. We affirm.

1

¶ 3                                    I. Background

¶ 4      The defendant was charged with five counts of first-degree murder (720 ILCS 5/9-1(a)(1) (West 1992)). The five victims were David Thompson, Cedric Gardner, Marion Jennings, Bedford Jennings, and Jeff Mosby. On October 1, 1994, the defendant was convicted and sentenced to natural-life imprisonment. On appeal, his convictions were reversed because his defense counsel had a conflict of interest for representing three of the State's witnesses. *People v. Coleman*, 301 Ill. App. 3d 290 (1998). On July 15, 1999, at retrial, the defendant was again convicted. He was sentenced to natural-life imprisonment on August 31, 1999. On appeal, this court affirmed. *People v. Coleman*, No. 5-99-0592 (Feb. 6, 2002) (unpublished order under Illinois Supreme Court Rule 23). The defendant then filed his first postconviction petition on August 26, 2022, that ultimately went to a third stage evidentiary hearing. The trial court denied the petition, and the defendant appealed arguing that the trial court failed to consider or rule on the allegations contained in his *pro se* supplemental postconviction petition. This court affirmed. *People v. Coleman*, No. 5-07-0069 (Nov. 25, 2009) (unpublished order under Illinois Supreme Court Rule 23).

¶ 5      The facts contained herein have been largely extracted from the appellate court order on direct appeal after retrial. *People v. Coleman*, No. 5-99-0592 (Feb. 6, 2002) (unpublished order under Illinois Supreme Court Rule 23). Kimberly Fulton (Fulton) testified that on November 17, 1993, she lived in Madison, Illinois, on Hare Street in a trailer with her three children and Jeff Mosby (Mosby). Her children were Christopher, then age 8; Andrew, then age 3; and Jeremy, then age 1. Fulton's neighbors in an adjacent trailer were David Thompson (Thompson), Marion Jennings (Marion), and Bedford Jennings (Bedford).

¶ 6      Sometime after 5 p.m. on November 17, 1993, Fulton left the trailer. She picked up Demetria McIntyre (McIntyre), and eventually, Fulton and McIntyre returned to Fulton's trailer

2

about 10 or 10:15 p.m. When Fulton pulled up to her trailer, she saw three men run from Thompson's trailer and get into a green minivan. Fulton did not pay close attention to the three men because there was usually "traffic" at Thompson's trailer.

¶ 7      Fulton went to the front door of her trailer, where she saw Mosby lying on the floor between the kitchen and the living room. While trying to arouse Mosby, she turned him over, raised his shirt, and saw a "hole in his chest." Fulton started to go to Thompson's trailer for help but stopped when she saw that the gate was open. Fulton explained that Thompson's house was a "drug house" and that the gate was not usually open, so she knew something was wrong.

¶ 8      Fulton also testified that the box where she kept important papers had been overturned and that her papers were scattered on her bed. Fulton usually kept the box in the closet in her bedroom.

¶ 9      Fulton stated that she went to school with the defendant. She had seen the defendant go into Thompson's trailer one or two times before November 17. Fulton had never met Sherrell Towns (Towns), a codefendant in this case.

¶ 10     McIntyre corroborated that she was with Fulton the evening of November 17, 1993, and that she returned to Fulton's trailer with her that night. McIntyre did not see the minivan at Thompson's trailer, but she admitted that she did not have her glasses on that evening.

¶ 11     Christopher Fulton (Christopher) testified that he was eight years old at the time of the murders. The night of November 17, 1993, Christopher and his two brothers were home with Mosby, because his mother had gone out earlier. Mosby was outside barbecuing when "they" knocked on the door of the trailer. When the three men came into the trailer, Mosby came inside and asked the men what they wanted. The men said they wanted money. Two of the men went into Christopher's mother's bedroom, and Christopher saw "paper fly out of the closet." When the two men came out of the bedroom, one of the men shot Mosby. Christopher testified that one of the

3

three men was "Little Mike," who at the trial he identified as the defendant. Christopher saw the three men leave in a green minivan.

¶ 12    Yuenna Sanders (Sanders) testified that on November 17, 1993, Cedric Gardner (Gardner) was her boyfriend. Gardner lived with Thompson in Madison on Hare Street in a trailer. Sanders stated there were locked bars over the door of Thompson's trailer, and only Thompson had a key. If someone came to Thompson's trailer and knocked, they were only admitted if the person was someone the occupants knew.

¶ 13    Alvin Laws (Laws) testified that he had known Mosby for 10 or 15 years and that he had been to Mosby's trailer. Laws had been inside Thompson's trailer to do some repair work. Laws also testified that Thompson's trailer had bars on the door and that only Thompson could let a person inside.

¶ 14    Laws was in the neighborhood of Hare Street the night of November 17, 1993. He was standing on the street just around the corner from Thompson's trailer, when a green minivan went by at a fast speed. Laws saw three people inside the van but was unable to identify any of them because the van was going too fast and the people had hoods over their heads, partially hiding their faces. Laws admitted on cross-examination that he is currently on parole for his conviction of delivery of a controlled substance and that he had served three years in prison.

¶ 15    Candice Branch (Branch) testified that on November 17, 1993, she lived down the street from Thompson. Branch was walking home at about 10 o'clock that night. Branch had to walk past Thompson's trailer to get home. Branch saw three men standing by Thompson's mailbox. She also saw a van parked by the fence. Branch heard one of the men say something that frightened her, so she hurried home. Later, she saw Towns, who she recognized as one of the three men

4

outside Thompson's trailer the night of November 17. She also identified Towns—from a photographic lineup—as one of the men she had seen that night.

¶ 16    Odette Brent (Brent) testified that Thompson was her boyfriend on November 17, 1993. She corroborated that a person could only get into Thompson's trailer through the locked bars on the front door, that Thompson was the only person who possessed a key, and that Thompson never let anyone into the trailer that he did not know. Brent stated that both she and Thompson knew the defendant.

¶ 17    Warren Rice, the office manager for Dave Croft Motors (Croft Motors), testified that a 1994 green minivan was rented to Elmer Jennings (Jennings) on November 6, 1993. Additionally, a stipulation was entered that if John Kemp testified, he would state that the 1994 green minivan rented from Croft Motors was not returned before November 24, 1993.

¶ 18    Jennings testified that he rented a green minivan from Croft Motors in November 1993 for Roosevelt Towns (Roosevelt), because Roosevelt did not have a driver's license. Roosevelt drove the van home after Jennings rented it. Jennings also saw Towns driving the minivan. Jennings saw Towns washing the minivan at a car wash on November 18, 1993, the day after the murders.

¶ 19    Darren Wise (Wise) testified that he knew Thompson, and he also had known the defendant a long time. Wise had seen the defendant at Thompson's trailer. On the night of November 17, 1993, Wise came out of his mother's house, which was a block away from Thompson's trailer. Wise heard a gunshot. When Wise walked down the street, he saw a green minivan speeding past his mother's street. Wise did not see how many people were in the van.

¶ 20    Yulanda Allen (Allen) testified that Towns was her boyfriend in November 1993. She stated that she knew the defendant by sight. Sometime late in the evening on November 17, 1993, Allen stopped by Towns's house. At the trial, she was unable to recall who was with Towns, but

5

she recalled testifying at an earlier proceeding and admitted that she testified that she saw the defendant and Ramone Williams (Williams) with Towns that night. Allen also testified that she saw Towns with a green minivan.

¶ 21 Johnnie Mosley (Mosley) testified that he was on parole after serving prison time for theft. Mosley stated that Towns is his cousin, and that Williams and the defendant are his friends. Mosley had seen the defendant, Williams, and Towns together on a couple of occasions between February 1993 and October 1993. On November 17, 1993, Mosley lived with his fiancée and her mother. That night, Towns came by in a green minivan. Williams and Artis Murray (Murray) were with Towns. Towns asked Mosley if he wanted to go with Towns "to take care of some business," which Mosley interpreted to mean to commit an armed robbery. Mosley saw Towns with a 9-millimeter gun in his possession at the time. Mosley declined to go with Towns. Towns also told Mosley that he was going to go get the defendant, "Little Mike," because the defendant knew the people they were going to rob. Towns said the people were drug dealers and that he would "kill them if that's what he had to do."

¶ 22 Chontelle Clark (Clark) testified that she knew Towns and that she had seen the defendant and Williams with Towns. On November 17, 1993, at about 10:30 p.m., Clark was driving toward Washington Park when she saw the defendant, Williams, and Towns drive past her in a dark-colored vehicle.

¶ 23 Murray testified that on November 17, 1993, he spent the night with his girlfriend, Dawn Russell (Russell), at the Sleepy Hollow Motel. The following morning, Towns picked him up in a green minivan, and they went to a car wash, where Towns washed the van and vacuumed the inside. Murray was arrested with Towns that same day, November 18, 1993. Russell corroborated that she and Murray spent the evening and the night together at the motel on November 17, 1993.

6

A stipulation entered into evidence established that if Mrs. Tucker, a desk clerk at the Sleepy Hollow Motel, was called to testify, she would corroborate that she rented a motel room to Russell at 7 p.m. on November 17, 1993.

¶ 24    Alfred Lumpkins (Lumpkins) testified that he had been convicted for writing bad checks and that he was in jail in late 1993 and early 1994. The defendant was placed in his cellblock. Lumpkins stated that he and the defendant discussed their cases. The defendant told Lumpkins that he went to buy some drugs from a couple of people the defendant knew in Madison. Two other men went with the defendant. The defendant went to the door, and once inside, the defendant motioned for the other two men to join him. Inside the trailer, the defendant ordered the others to tape the victims' hands behind their backs. According to Lumpkins, the defendant said there were four victims. Because the people could identify the defendant, the defendant ordered the other two men to shoot the victims. The defendant told Lumpkins that they ransacked the trailer for drugs and money. Lumpkins described what the defendant told him happened when they were leaving: "[T]here was a guy standing outside the door that could witness him so he ordered somebody to shoot him. And there was an eight-year-old boy that could recognize him coming out [of] the trailer that evening." The defendant also told Lumpkins that they went to the defendant's uncle's house afterwards, where they burned their clothes. The defendant then went to St. Louis to a nightclub. Lumpkins informed police officers about his conversations with the defendant.

¶ 25    Subsequently, Lumpkins's bail was reduced, and he was released on bond. Lumpkins also testified on cross-examination that several petitions to revoke his probation had been filed but that he has not been sent to prison. There was also a warrant issued for a forgery he committed, but the warrant was recalled.

¶ 26    Defense counsel asked Lumpkins the following questions:

"Q. Why would Michael Coleman tell you all this?

A. Well, we was [*sic*] talking about our cases.

\* \* \*

[Court reporter repeats the question above.]

A. Well, we was [*sic*] discussing my case.

Q. Is that the only reason?

A. Well, I mean I knew him from the street from buying drugs from him."

¶ 27 Michael Lockett (Michael) and his brother, Robert Lockett (Robert), testified to substantially the same evidence. Both Michael and Robert were in jail for unrelated crimes when the defendant was jailed for the five murders. Michael, Robert, and the defendant were represented by the same attorney, Thomas Hildebrand (Hildebrand). Hildebrand would have the people he was representing pulled from their cells at the same time, and they would all wait to see him in the visiting room. On one occasion, while the three men were waiting in the visiting room to see Hildebrand, the defendant got into an argument with another prisoner. Michael intervened. The defendant, who had known Michael and Robert before they were incarcerated and had "hung out" with them, started talking to Robert. Michael overheard the conversation between the defendant and Robert.

¶ 28 Michael testified that the defendant told Robert that he got inside the door of the trailer and that one of the other two men with him accidentally shot one of the victims. Michael continued: "[S]o therefore he did them all, and he had to go next door to take care of the guy there because he knew Little Mike." The defendant told Robert that the other two men with him that night were Towns and Williams. After Michael overheard the conversation between the defendant and Robert, he subsequently wrote a letter to the police about what he had heard.

8

¶ 29 Defense counsel questioned Michael regarding his reasons for testifying against the defendant as follows:

"Q. Because you want some consideration for all of [your testimony]?

A. No.

Q. Just because you want to tell the jury the truth?

A. The only reason why I'm truly up here is because after I testified the first time—

* * *

Q. So you have testified before?

A. Right.

Q. And why are you here then?

A. Because after—

Q. We aren't going to—

A. We aren't going to what? Do you want the truth or don't you?

Q. I want the truth[,] but I don't want you to be too self-serving.

A. I'm not going to be self-serving. I'm just going to tell you exactly as I see it, what the truth being. I'm not going to lie. I'm not here to lie.

Q. Okay.

A. Now do you want the truth?

Q. Why are you here?

A. Because after I testified the first time I was shot at about 12 times. The people who did it were his friends. It's right there in the St. Louis police report.

Q. So you're—

A. Making sure that he doesn't get out."

9

¶ 30     Robert testified that he was in the same cellblock as Towns. Robert explained that in the summer of 1993, he and Michael would ride around with the defendant. On one occasion, the defendant pointed out Thompson and Bedford to Robert, and the defendant said, "they were about to come into a lick," which, Robert explained, meant that they were going to get an amount of drugs and money. The defendant suggested to Robert and Michael that they rob Thompson, but this did not occur because Michael was arrested, and Robert said he was "evading charges."

¶ 31     Robert also testified concerning his conversation with the defendant while waiting to see Hildebrand. According to Robert, the defendant asked him about Towns. The defendant told Robert that he got Towns and Williams inside Thompson's trailer. Robert described what the defendant told him: "[T]he dude reacted the way he reacted[;] then he got hit in the chest." The defendant said they had to kill all of them because they had seen the defendant's face. The defendant said that was the same reason they had to shoot Mosby. Robert gave this information to the sheriff's office, and after his assistance, the police released him from jail.

¶ 32     Mark Johnsey (Johnsey) and Morrie Fraser (Fraser), crime scene investigators for the Illinois State Police, testified that they investigated both crime scenes on November 17, 1993. Johnsey investigated the crime scene at Thompson's trailer, while Fraser investigated the crime scene at Mosby's trailer. Johnsey stated that there were three bodies at Thompson's trailer when he arrived and that a deputy told him that a fourth person had been taken to a hospital. Johnsey found Bedford's hands, mouth, and ankles bound with duct tape. Thompson also had duct tape on his ankles, but only his right wrist had duct tape on it. Marion was not bound in any manner. Johnsey found projectiles and shell casings at Thompson's trailer. Johnsey attended all five men's autopsies and collected a metal fragment removed from Gardner's head. Fraser found a shell casing at Mosby's trailer. Fraser also collected the documents that were strewn on Fulton's bed.

10

¶ 33    Stephen Nonn (Nonn), a deputy sheriff for Madison County, testified that he assisted in the crime scene investigation at Hare Street on November 17, 1993. He also testified that he arrested Towns on November 18, 1993. At the time, Towns was wearing a black, long-sleeved, hooded sweatshirt. Nonn also seized a green minivan and the defendant's vehicle for processing. Nonn interviewed the defendant who denied knowing Towns.

¶ 34    Thomas Gamboe, a forensic scientist for the Illinois State Police, testified that he analyzed the shell casings and spent projectiles found at the crime scene. He determined that the shell casings were fired from a 9-millimeter handgun and that all the shells were fired from the same gun. He also determined that three of the four spent projectiles were fired from the same gun.

¶ 35    Gerald Warner, another forensic scientist with the Illinois State Police, testified that he examined fingerprints from duct tape removed from Gardner, Bedford, and Thompson. Warner stated that the fingerprints on the duct tape were a match for Towns's fingerprints. Warner also found Towns's fingerprints on the documents in Mosby's trailer.

¶ 36    A stipulation entered into evidence established that if the doctors who performed the five autopsies were called to testify, they would state that Gardner died from a gunshot wound to the head, Thompson died from a gunshot wound to the head, Marion died from gunshot wounds to the head and chest, Bedford died from a gunshot wound to the head, and Mosby died from a gunshot wound to the chest.

¶ 37    The defendant's grandmother, Henrietta Washington, testified that the defendant lived with her in November 1993. She stated that on the night of November 17, 1993, the defendant left the house "just before the news came on," meaning the 10 o'clock news.

¶ 38    Eric Coleman (Eric), the defendant's cousin, testified that he also lived with his grandmother. According to Eric, he and the defendant left the house around 8 p.m. on November

11

17, 1993, but he admitted that he testified in an earlier proceeding that they had left the house around 10 p.m. Eric stated that he and the defendant went to a nightclub in St. Louis and that they arrived there around 10:15 p.m. After staying for about a half hour, Eric and the defendant went to Club Hollywood in East St. Louis. Eric stated they arrived at this nightclub around midnight and that they left about 2 a.m.

¶ 39    Another stipulation admitted into evidence established that if Jeff Bridick, a Madison County deputy sheriff, was called to testify, he would state that he interviewed Christopher, that Christopher described the gun used to shoot Mosby as a revolver, that Christopher could not name or did not know any of the three men involved, and that Bridick "did not try to thoroughly glean every detail from Christopher Fulton and that Christopher was shook up at the time."

¶ 40    Michelle Garrett (Garrett) testified in rebuttal that she has known the defendant most of her life. She went to Club Hollywood between 11 p.m. and midnight on November 17, 1993. Garrett stated that the defendant arrived at the nightclub with his cousin Eric after she did. After the murders, Garrett received a call from the defendant, who was in jail. The defendant asked her to lie about the time she saw him at the nightclub and to say that she saw him at the club earlier than she did.

¶ 41    Irhett Riley (Riley) also testified that the defendant, whom she has known for "years," called her approximately two months before the trial. The defendant identified himself as "Little Mike" when he called. The defendant asked Riley to tell Garrett not to "come to court Wednesday."

¶ 42    On July 15, 1999, the defendant was again convicted of five counts of first-degree murder and was sentenced to natural-life imprisonment. The defendant appealed raising multiple issues, and this court affirmed his convictions and sentences, finding that the evidence was not closely

12

balanced and that the evidence was "overwhelming." *People v. Coleman*, No. 5-99-0592 (Feb. 6, 2002) (unpublished order under Illinois Supreme Court Rule 23).

¶ 43    The defendant then sought postconviction review on August 26, 2002. On February 18, 2003, he supplemented his postconviction petition. The case ultimately proceeded to a third stage evidentiary hearing. The judge denied the postconviction petition on January 29, 2007. The defendant appealed arguing that the court did not consider or rule upon his supplemental petition. On November 25, 2009, this court affirmed the denial of his postconviction pleadings. *People v. Coleman*, No. 5-07-0069 (Nov. 25, 2009) (unpublished order under Illinois Supreme Court Rule 23).

¶ 44    On July 30, 2013, the defendant filed a *pro se* motion for leave to file a successive postconviction petition, asserting that the child witness, Christopher, had come forward to admit that he had lied during the trial when he identified the defendant. Christopher stated that he told the police that the three men who shot Mosby had hoods covering their faces, but the police showed him a photo of the defendant and told him to testify that the defendant was one of the three hooded men. Christopher stated that he informed the prosecutor that the police asked him to falsify the defendant's identification, but the State still called him as a witness.

¶ 45    In addition to Christopher's affidavit, the defendant also attached affidavits from Zemry M. Ransom (Ransom) and his codefendant, Williams, to his motion seeking leave to file a successive postconviction petition. Ransom stated that Christopher told him that he gave false testimony at the defendant's trial. Ransom then passed that information to the defendant. In his affidavit, Williams admitted that he pled guilty to the five murders but stated he refused to cooperate with the State. The State approached him through his attorney about a possible plea deal

if he would testify against the defendant. Williams stated that he told the prosecutors that the defendant was not with him on the night of the murders.

¶ 46    The trial court appointed counsel, Rand S. Hale (Hale), to represent the defendant in his attempt to have a successive postconviction petition approved. On September 11, 2014, the defendant asked the court to change appointed counsel on the basis that attorney Hale had a conflict of interest because one of the prosecutors in the underlying murder cases, Keith Jensen, had been partners in a legal practice with attorney Hale. On February 25, 2015, the trial court held a hearing on the defendant's motion. During the hearing, the trial court asked attorney Hale for information about his association with the prosecutor, Keith Jensen. Attorney Hale confirmed that they had worked in the same law firm but informed the court that this partnership ended in 1995 before the defendant's case went to trial. The court denied the defendant's request to change appointed counsel.

¶ 47    Iin support of his petition for leave to file a successive postconviction petition, the defendant filed several affidavits. On February 25, 2015, the defendant filed an affidavit of Keith Sanders (Sanders) dated December 19, 2014, in which Sanders stated that he saw a green van around 10 p.m. on November 17, 1993. Sanders indicated that Towns, Williams, and Murray were in this green van. Sanders stated that he did not come forward before then because he did not like the defendant because they both dated the same woman. The defendant also filed his own affidavit dated December 29, 2014, stating that he just "met up" with Sanders in prison and learned what Sanders saw on the night of the murders. The defendant filed Towns's affidavit dated December 29, 2014, in which Towns stated that the defendant was not involved in the murders and that he was offered leniency by prosecutor Keith Jensen if he would implicate the defendant. Towns also stated that the defendant's attorneys never asked him to testify at the defendant's trials. Finally,

the defendant filed an affidavit of Eric Coleman dated July 26, 2002. Eric stated that he was with the defendant on the night of the murders and that police threatened him with arrest if he refused to deny that the defendant was with him that night. Eric refused to testify for the State and was then arrested and charged with perjury. Although Eric testified for the defendant, the jury was not informed that the State charged him for not cooperating.

¶ 48    On May 26, 2015, the defendant filed a *pro se* petition for leave to file an amended successive postconviction petition. In the petition, the defendant stated that he would present evidence of actual innocence.

¶ 49    On June 3, 2015, after a hearing, the trial court granted the defendant leave to file his successive postconviction petition, advancing it to the second stage. The State filed a motion to dismiss on June 1, 2016, claiming that the defendant had not shown actual innocence.

¶ 50    On July 27, 2015, the defendant filed his *pro se* amended successive postconviction petition. On August 5, 2015, the defendant's appointed counsel filed a motion asking the trial court to incorporate the defendant's supplemental pleading, which was granted.

¶ 51    In January 2016, the defendant directly sent a letter to the trial judge advising that he had sent his appointed counsel six letters to which counsel had not responded. The defendant and his family also phoned appointed counsel seven times. The attorney did not speak with the defendant or his family members and did not respond to the messages left. Thereafter, on January 26, 2016, the defendant filed a motion asking the trial court to disqualify his appointed attorney, Hale. The defendant again alleged that Hale had a conflict of interest due to his past affiliation with prosecutor Keith Jensen. He stated that attorney Hale made false statements to the trial court at the hearing on the previous motion to disqualify. In support, the defendant attached Madison County circuit court docket sheets for three court dates during the underlying prosecution showing that

attorney Hale's name appeared alongside prosecutor Keith Jensen's name on the docket sheets as representing the State. The defendant alleged that Hale's representation of the State in his murder prosecution represented a *per se* conflict. In addition, the defendant alleged that attorney Hale represented him in his original postconviction proceedings, and that Hale refused to include "meritorious claims" requested by the defendant. On February 22, 2016, the trial court denied the defendant's motion to disqualify Hale as his attorney.

¶ 52    On June 1, 2016, a new attorney—private counsel—entered his appearance on the defendant's behalf. On August 18, 2016, this new attorney filed a second successive petition for postconviction relief incorporating the defendant's *pro se* petition. By order dated March 28, 2017, and file-stamped March 30, 2017, the trial court denied the State's motion to dismiss, and the petition advanced to the third stage evidentiary hearing. The court set the hearing for July 11, 2017.

¶ 53    On June 19, 2017, the defendant's counsel filed a motion to continue the third stage hearing because he was scheduled for a federal trial on that date. The trial court granted the continuance and set the case for hearing on August 7, 2017. In August 2017, the defendant's counsel sought another continuance due to the death of counsel's father. The court granted the continuance and set the hearing for November 14, 2017.

¶ 54    On November 1, 2017, the defendant's private attorney filed a motion to withdraw citing irreconcilable differences that prevented his continued representation of the defendant. The trial court granted this request on November 14, 2017. Over the next 10 months, the defendant kept the court informed of his attempts to find alternate counsel.

¶ 55    On September 25, 2018, the court appointed a special public defender, Calvin Fuller (Fuller), to represent the defendant. On April 22, 2020, the trial court examined a possible conflict

16

of interest because Fuller had been employed by the Madison County State's Attorney when the defendant was tried. The court found no conflict.

¶ 56    On May 4, 2020, the defendant's attorney filed a pleading indicating that the defendant had directed him not to amend the pleadings filed by previous counsel. The court held a hearing on March 17, 2021, during which the defendant and counsel clarified that the defendant would be proceeding on the amended petition filed by private counsel on August 18, 2016.

¶ 57    The trial court set the third stage hearing for April 28, 2021. On April 23, 2021, the defendant asked for a continuance as he needed more time to serve the witness Christopher with a subpoena. The court granted this request and set the hearing for May 25, 2021.

¶ 58    On May 25, 2021, the defendant's counsel verbally sought a continuance of the evidentiary hearing to locate two witnesses—Christopher and Williams—who he planned to call at the hearing, stating that these two witnesses were essential to confirm the details of their affidavits. At that time, Christopher had a warrant for his arrest and Williams had been subpoenaed twice. The defendant's attorney informed the court of the steps he had taken to secure the appearances of Christopher and Williams. For Christopher, the attorney went to the probation department and the State to obtain three different addresses. Subpoenas for all three addresses were left with the sheriff for service. One of the subpoenas was returned on April 19, 2021, with a handwritten note that Christopher "stated will not testify on the case." Williams was originally served by leaving a copy of the subpoena at his abode. A second service attempt was unsuccessful as Williams could not then be found.

¶ 59    Before ruling on the motion for a continuance, the trial court noted that the successive postconviction petition was filed in 2013, that different attorneys had represented the defendant over the years, and that the COVID-19 pandemic had made advancing this case difficult. When

17

Madison County resumed in-person hearings in February 2021, the trial court set the third stage hearing for April 28, 2021, at which time the court advised counsel that absent good cause supported by affidavit, the case would not be continued. However, despite the original admonishment, the defendant sought a continuance for that hearing date, which the trial court granted. The court denied the motion to continue the hearing a second time and stated that it had "exercised extreme patience in allowing [the defendant] time to locate his witnesses."

¶ 60    After the motion to continue was denied, defense counsel moved to admit the affidavits of Christopher, Williams, and Ransom into evidence. The State objected to admission of the affidavits "being used in lieu of the testimony of actual witnesses." In response, defense counsel noted that the affidavits would not have the same effect as in-person testimony, but argued that the court could receive the affidavits in evidence at the third stage of the postconviction process. The trial court denied the admission of these affidavits in evidence. The court stated that given the nature of the statements in the affidavits, it would require these witnesses to testify in person "[if] [s]omeone's going to recant their testimony or take the stand and say that they're solely responsible for the deaths of these individuals."

¶ 61    During the hearing, the defendant called his cousin, Eric, as a witness. Eric testified that the defendant was with him the entire day of November 17, 1993. He testified that when he informed the State that he could provide the defendant with an alibi, he was jailed and charged with perjury. Eric testified that he spent 30 to 45 days in custody and that the perjury charges were ultimately dismissed one to two years later.

¶ 62    The defendant also called Bridick, a former parole deputy, to testify at the hearing. Bridick had spoken to Christopher at the scene of the shooting on November 17, 1993. Bridick testified that there was nothing in his notes from that conversation indicating that Christopher said that the

18

three men had hoods over their faces. However, Bridick confirmed that Christopher did not name the individuals he saw that night.

¶ 63    At the conclusion of the hearing, the defendant's attorney argued that Bridick's testimony that Christopher did not initially identify one of the intruders was consistent with Christopher's affidavit. He argued that considering the consistency of Christopher's conversation with Bridick and Christopher's affidavit, coupled with the defendant's alibi from Eric, it was clear that Christopher's initial identification of the defendant was coerced. The State argued that Christopher identified the defendant at trial, and that Eric provided the same alibi testimony before the grand jury, and yet the grand jury indicted the defendant.

¶ 64    The court noted that the testimony heard during the evidentiary hearing was the same as the trial court evidence. Without evidence that Christopher lied in his testimony during the trial and was threatened or coerced into identifying the defendant as one of the three men, the court concluded that the defendant failed to satisfy his burden of proof and denied the defendant's petition. The court's written order stated that Christopher and Williams did not appear, and that the defendant's petition was denied due to lack of evidence. The defendant timely appealed from this order.

¶ 65                                    II. Analysis

¶ 66    The defendant argues that the trial court abused its discretion in denying his request for a continuance to obtain the live testimony of his witnesses at the evidentiary hearing. The defendant also argues that the trial court exacerbated its error by refusing his request to admit the notarized affidavits into evidence in lieu of the intended live testimony.

¶ 67    The Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2020)) provides a three-stage process by which a criminal defendant can challenge his conviction on the basis that his

constitutional rights were substantially denied. *People v. Beaman*, 229 Ill. 2d 56, 71 (2008); *People v. Nelson*, 2016 IL App (4th) 140168, ¶ 14. The third stage of the successive postconviction hearing process is at issue in this case.

¶ 68     A postconviction petition will survive a motion to dismiss and advance to the third stage if the defendant has made a " 'substantial showing of a constitutional violation.' " *People v. York*, 2016 IL App (5th) 130579, ¶ 16 (quoting *People v. Little*, 2012 IL App (5th) 100547, ¶ 12). The third stage involves an evidentiary hearing on the defendant's claims. *Id.* If the defendant successfully "makes the requisite substantial showing that his constitutional rights were violated, he is entitled to a third stage evidentiary hearing." *People v. Domagala*, 2013 IL 113688, ¶ 34 (citing *People v. Edwards*, 197 Ill. 2d 239, 246 (2001)).  At the third stage hearing, the trial court serves as the finder of fact and determines witness credibility, decides the weight to be given testimony and evidence, and resolves any evidentiary conflicts. *Id.* (citing *People v. English*, 2013 IL 112890, ¶ 23). The trial court must then determine if the evidence introduced at the hearing establishes that the defendant is entitled to relief. *Id.*

¶ 69     Generally, at the third stage of postconviction proceedings, the reviewing court will not reverse the lower court's decision to deny the claim after the evidentiary hearing unless that decision is manifestly erroneous. *People v. Calhoun*, 351 Ill. App. 3d 1072, 1078 (2004) (citing *People v. Childress*, 191 Ill. 2d 168, 174 (2000)). The trial court's ruling is entitled to substantial deference. *People v. Jones*, 2012 IL App (1st) 093180, ¶ 49 (citing *People v. Scott*, 194 Ill. 2d 268, 276 (2000)).

¶ 70     Here, the defendant argues that a different standard of review applies to the issues on appeal because the errors were committed prior to holding the hearing when the trial court first denied his request for a continuance, and secondly when the trial court denied his request to admit the

20

affidavits into evidence. Accordingly, as the evidentiary hearing had not yet been held, we agree with the defendant that the proper standard of review is whether the trial court abused its discretion. *People v. Chapman*, 194 Ill. 2d 186, 241 (2000); *Jones*, 2012 IL App (1st) 093180, ¶ 52. A trial court abuses its discretion if its decision is arbitrary, fanciful, or unreasonable, or when no reasonable person would take the view adopted by the trial court. *People v. Donoho*, 204 Ill. 2d 159, 182 (2003).

¶ 71    The first prehearing issue addressed by the trial court was the defendant's request for a continuance to allow additional time to find and serve two witnesses. The testimony of both witnesses, based upon the contents of their previously filed affidavits, was critical to the defendant's actual innocence claim.

¶ 72    Each case turns on its individual facts and circumstances when determining if the trial court abused its discretion in denying a continuance request. *People v. Walker*, 232 Ill. 2d 113, 125 (2009). In considering the continuance request, the trial court can consider the movant's diligence, the interests of justice, the history of the case, the complexity of the matter, docket management, judicial economy, and inconvenience of the parties. *Id.* at 125-26; *People v. Balfour*, 2015 IL App (1st) 122325, ¶ 48.

¶ 73    "In reviewing the denial of such a motion, the factors to be considered are: (1) whether the defendant was diligent in attempting to secure the witness for trial, (2) whether defendant has shown that the testimony was material and might have affected the jury's verdict, and (3) whether defendant was prejudiced by the denial of the motion for continuance." *People v. Scales*, 307 Ill. App. 3d 356, 358 (1999) (citing *People v. Ward*, 154 Ill. 2d 272, 307 (1992)). However, the trial court's denial of a motion for continuance will not constitute an abuse of discretion if there is no "reasonable expectation that the witness will be available in the foreseeable future." *Id.*; see also

*People v. Ruiz*, 342 Ill. App. 3d 750, 761 (2003) (quoting *People v. Watts*, 195 Ill. App. 3d 899, 917 (1990)).

¶ 74    We start with the materiality of the anticipated testimony. There is no question that the purported testimony of these two witnesses would have been material. Christopher's affidavit indicated that he gave false testimony at the defendant's trial; that he could not have identified the defendant as being present on the night of the murders because the faces of the three men were obscured; and that he was coerced to identify the defendant as one of the men by law enforcement. It was notable that Christopher was a child at the time he was allegedly convinced to falsify his testimony against the defendant, and that as an adult, he had determined that he needed to rectify the harm done by his allegedly false testimony. Williams would have apparently testified that while he was involved in these murders, the defendant was not present on that evening. Accomplice testimony has been found to be inherently suspect. *People v. Fane*, 2021 IL 126715, ¶¶ 35-43. However, considering the anticipated testimony of both witnesses, this evidence would have been material.

¶ 75    While we find that the evidence at issue was material, we are not able to conclude that the defendant established his diligence. In determining whether to allow a continuance, the trial court may consider the history of the case. *Walker*, 232 Ill. 2d at 125-26.

¶ 76    This successive postconviction petition was filed by the defendant on July 30, 2013. The trial court appointed counsel to assist the defendant, and after a June 3, 2015, hearing, the trial court granted the defendant's request to file his petition, advancing the case to the second stage. Shortly thereafter, the defendant filed a *pro se* amended successive postconviction petition. One year later, the State filed its motion to dismiss, which the trial court denied on March 30, 2017, sending this case to the third stage. Various appointed and hired counsel issues resulted in

22

significant delays throughout the entirety of this successive postconviction petition case. Finally on March 17, 2021, the defendant advised that he was ready for his evidentiary hearing, which the court set for April 28, 2021. Just five days before that hearing date, the defendant filed a motion to continue the hearing citing the need for additional time to serve witness subpoenas. The trial court granted the request and moved the hearing date to May 25, 2021. However, despite the efforts outlined by defense counsel to obtain service on these two witnesses, service had not been achieved on either witness by May 25, 2021.

¶ 77    In assessing the trial court's decision to deny the defendant's request for yet another continuance and to proceed with the hearing, we find it significant that the defendant and his counsel advised the trial court that they would be ready for the hearing on its original hearing date of April 28, 2021. See *Ruiz*, 342 Ill. App. 3d at 761-62 (noting that the defendant indicated his preparedness for trial by filing a written demand for trial one month before jury selection); *People v. Davis*, 147 Ill. App. 3d 800, 803 (1986) (noting the defendant's trial demand in rejecting the defendant's claim that the trial court abused its discretion in denying his mid-trial motion for a continuance).

¶ 78    In this case, the defendant did not request a continuance for a set amount of time and did not detail to the court how he intended to locate and serve these two witnesses. On the date of the hearing, the defendant had already been attempting to find the witnesses for about two months without success. With respect to Williams, the defendant's attorney reported to the court that Williams could not be located, that he did not know if Williams was aware of the first subpoena, and that he did not believe Williams knew about the second subpoena. With respect to Christopher, the defendant's attorney asked the trial court to continue hearing with the hope that Christopher would eventually be arrested on an outstanding warrant. As the court noted, a 2017 subpoena for

23

Christopher had been marked as "unable to serve," while the more recent April 2021 subpoena had been marked with a note indicating that Christopher "stated will not testify on the case." At best, the defendant's attorney could only speculate that service could eventually be achieved on these two witnesses, and with Christopher, there was no explanation as to his apparent statement that he was not going to testify in this matter.

¶ 79   Under the unique circumstances and lengthy history of this case, we find no basis to conclude that the trial court abused its discretion in denying the defendant's request for additional time. *Scales*, 307 Ill. App. 3d at 358 (citing *Ward*, 154 Ill. 2d at 307). We find the trial court's ruling was amply supported by the fact that there was no " 'reasonable expectation that the witness[es] will be available in the foreseeable future.' " *Ruiz*, 342 Ill. App. 3d at 761 (quoting *Watts*, 195 Ill. App. 3d at 917).

¶ 80   Without a reasonable expectation that the witnesses would ever be located and willingly testify, we also find that the defendant was not prejudiced by the court's denial of his request for a continuance. *Id.* at 762; *Scales*, 307 Ill. App. 3d at 358-59.

¶ 81   We next turn to the trial court's refusal to accept the notarized affidavits into evidence at the third stage hearing. "The rules of evidence are not abandoned during an evidentiary hearing on a postconviction petition." *Jones*, 2012 IL App (1st) 093180, ¶ 52. Whether the trial court decided to admit evidence is within the court's discretion. *Id.* At a third stage evidentiary hearing, the trial court can accept affidavits in lieu of live testimony. *Domagala*, 2013 IL 113688, ¶ 34. Moreover, the legislature contemplated the possibility of using verified affidavits as evidence: "[t]he petition shall have attached thereto affidavits, records, or other evidence supporting its allegations or shall state why the same are not attached." 725 ILCS 5/122-2 (West 2020). Section 122-6 of the Post-Conviction Hearing Act further provides: "The court may receive proof by affidavits, depositions,

24

oral testimony, or other evidence." *Id.* § 122-6. At a third stage evidentiary hearing, the trial court is the finder of fact and thus must determine witness credibility, determine the weight to be given to testimony and evidence, and ultimately resolve any evidentiary conflicts. *Domagala*, 2013 IL 113688, ¶ 34.

¶ 82 The trial court has great discretion "to limit the type of evidence it will admit" at a postconviction evidentiary hearing. *People v. Coleman*, 206 Ill. 2d 261, 278 (2002); *Jones*, 2012 IL App (1st) 093180, ¶ 52. Evidentiary determinations will not be overturned on appeal absent a clear showing of an abuse of discretion. *Id.* On appeal, courts "routinely entrust trial judges with the discretion to decide whether hearsay evidence is reliable enough to be admitted at a hearing, and, if so, how much weight the hearsay evidence deserves." *People v. Gibson*, 2018 IL App (1st) 162177, ¶ 139.

¶ 83 While the trial court clearly had the ability to accept the affidavits into evidence and to consider them in reaching its ruling, the trial court also maintained the discretion to exclude the evidence. *People v. Brooks*, 2021 IL App (4th) 200573, ¶¶ 55-58. The trial court acknowledged on the record that it could admit the affidavits. However, because of the potential significance of the anticipated recantation of trial testimony, the court indicated that it required such evidence to be in-person. The State correctly argued that admission of the affidavits was problematic because it had no ability to cross-examine the witnesses. Additionally, live testimony would have allowed the trial court to observe the witnesses for purposes of credibility. We find that the trial court's decision to deny the admission of the affidavits was within its sound discretion. Therefore, we do not find that the trial court abused its discretion. *Chapman*, 194 Ill. 2d at 241; *Donoho*, 204 Ill. 2d at 182.

¶ 84                                        III. Conclusion

¶ 85    For the foregoing reasons, the judgment of the circuit court of Madison County is hereby

affirmed.


¶ 86    Affirmed.